WENDY J. OLSON, IDAHO STATE BAR NO. 7634
UNITED STATES ATTORNEY
JUSTIN D. WHATCOTT, IDAHO STATE BAR NO. 6444
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA IV
800 EAST PARK BOULEVARD, SUITE 600
BOISE, ID 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-1413

DANIEL G. BOGDEN
UNITED STATES ATTORNEY
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
ASSISTANT UNITED STATES ATTORNEYS
NADIA J. AHMED
ERIN M. CREEGAN
SPECIAL ASSISTANT UNITED STATES ATTORNEYS
333 LAS VEGAS BLVD. SOUTH, SUITE 5000
LAS VEGAS, NEVADA  89101
PHONE: (702) 388-6336
FAX: (702) 388-6698

# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Case No. 16-ms-08428-CWD |
| Plaintiff, | ) |
| | ) |
| v. | ) **GOVERNMENT'S MEMORANDUM IN** |
| | ) **SUPPORT OF PRETRIAL DETENTION** |
| ERIC J. PARKER, | ) |
| | ) |
| Defendant. | ) |
| | ) |

The United States, by and through undersigned counsel, respectfully submits this

Memorandum in Support of its Motion for Pretrial Detention pursuant to The Bail Reform Act,

Title 18, United States Code, Section 3142.  As explained herein, the government seeks the

continued pretrial detention of defendant Eric J. Parker ("Parker") both as a risk of non-

appearance and as a danger to the safety of others and the community.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 1

Parker was a gunman/sniper in an unprecedented and extremely violent and massive armed assault on federal officers that occurred on April 12, 2014, while those officers were performing their duties as part of a court-ordered cattle impoundment operation.  But for the courage of the victim officers to back away from their assaulters and abandon the cattle, the actions of Parker and his co-conspirators would have resulted in catastrophic death or injury to the officers and others.  The fact that no one was shot, however, does not mitigate either the level of violence used that day or the intent behind it.



Parker was there because he answered a "call-to-arms" from his co-defendant, Cliven Bundy, to come to Nevada to forcibly stop federal law enforcement officers from the executing court orders to impound his cattle.  In response to the call, Parker knowingly traveled from Idaho to Nevada with firearms and ammunition and the intent to use them against those law enforcement officers.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 2

Knowingly joining Bundy's conspiracy, Parker's actions on April 12 betrayed his desire and willingness to kill cops. This alone compels the conclusion that Parker is a grave danger to the community and a flight risk. However, subsequent to April 12, Parker has openly embraced his notoriety of being "the man on the bridge" (i.e., the one aiming his assault rifle at cops) and has continued, along with his co-defendants, to advocate "matching force" with the federal government.

Parker is currently charged with crimes of violence including assault on a federal law enforcement officer, extortion by force and violence and using and brandishing firearms in connection with crimes of violence under Title 18, United States Code, Section 924(c). As such, the Bail Reform Act presumes that there are no conditions or combination of conditions that will ensure the safety of the community. Here, no evidence has been adduced during the investigation of the instant charges that rebuts that presumption. In fact, all the evidence suggests that Parker will continue to be a threat to law enforcement officers, will not abide by court orders, and will use threats of violence and violence to ensure that federal laws are not enforced as to him and others.

I.      **FACTS**

On March 2, 2016, a federal grand jury seated in the District of Nevada returned a Superseding Criminal Indictment, charging Parker and 18 other defendants with, among other things, conspiring to assault federal officers, obstruct justice, extort federal officers and use and brandish a firearm in relation to a crime of violence, and the substantive offenses that comprise the objects of the conspiracy, all in violation of Title 18, United States Code, Sections 371; 372 111(a)(1) and (b); 1503; 1951; and 924(c).

Parker was arrested on the instant charges on March 3, 2016 pursuant to an arrest warrant issued from the Superseding Indictment.  Based on the evidence adduced from its investigation to date, the government proffers the following in support of its motion for pretrial detention:

**A.      Background**

Parker, 32, resides in Hailey, Idaho, where he is married with two children.  Although previously employed as an electrician, his current employment is unknown.  But, as discussed below, since 2014 he spends significant time traveling the county "matching force" with the federal government.  His criminal history is unremarkable but for two misdemeanor convictions. Evidence indicates that Parker usually carries firearms on his person and in his truck.

Co-defendant, Cliven Bundy ("Bundy"), 69, is a long-time resident of Bunkerville, Nevada, living on 160 acres of land in a very rural and sparsely-populated area of the state. Bundy Ranch, as he refers to the property, is located near the Virgin River a few miles from where Interstate 15 crosses from Nevada into Arizona, approximately 90 miles northeast of Las Vegas, Nevada.  Bundy Ranch is surrounded by hundreds of thousands of acres of federal public lands commonly referred to as the Gold Butte area or the Bunkerville Allotment.  Bundy uses that entire range of land to graze his cattle unlawfully.

While Bundy claims he is a cattle rancher, his ranching operation – to the extent it can be called that – is unconventional if not bizarre. Rather than manage and control his cattle, he lets them run wild on the public lands with little, if any, human interaction until such time when he traps them and hauls them off to be sold or slaughtered for his own consumption.  He does not vaccinate or treat his cattle for disease; does not employ cowboys to control and herd them; does not manage or control breeding; has no knowledge of where all the cattle are located at any given time; rarely brands them before he captures them; and has to bait them into traps in order to gather them.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 4

Nor does he bring his cattle off the public lands in the off-season to feed them  when the already sparse food supply in the desert is even scarcer.  Raised in the wild, Bundy's cattle are left to fend for themselves year-round, fighting off predators and scrounging for the meager amounts of food and water available in the difficult and arid terrain that comprises the public lands in that area of the country.  Bereft of human interaction, his cattle that manage to survive are wild, mean and ornery. At the time of the events giving rise to the charges, Bundy's cattle numbered over 1,000 head, straying as far as 50 miles from his ranch and into the Lake Mead National Recreation Area ("LMNRA"), getting stuck in mud, wandering onto golf courses, straying onto the freeway – foraging aimlessly and wildly, roaming in small groups over hundreds of thousands of acres of federal lands that exist for the use of the general public for many other types of commercial and recreational uses such as camping, hunting, and hiking.

Bundy claims he has strong anti-federal government views, proclaiming that the federal government cannot own land under the U.S. Constitution.  These are not principled views – and certainly they have no merit legally – but nonetheless serve conveniently as a way for Bundy to somehow try to convince others that he has some reason for acting lawlessly, other than the obvious one: it serves his own ends and benefits him financially.  Untethering himself from the law, Bundy claims he can do with his cattle as he pleases, including not incurring the expenses to manage or control them and not paying for the forage they consume at the expense of federal taxpayers.

Federal law requires any rancher to pay fees and obtain grazing permits to run cattle on public lands.  The evidence suggests that before 1993, Bundy paid fees and kept current the permit his father before him had acquired for grazing cattle on the Bunkerville Allotment. In 1993, however, when BLM restricted both the number of head he could graze and the seasons during which he could graze them, Bundy was faced with the prospect of having to control his

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 5

herd and bring them off the land during the off-season.  It was then that Bundy claimed that he supposedly "fired the BLM" and refused, from then until to the present, to pay any grazing fees or submit to permits.

It appears that Bundy made some attempt to fight the 1993 restrictions administratively but to no avail.  But despite losing, he continued in his scofflaw ways, ignoring BLM regulations and restrictions pertaining to his use of the public lands, allowing his cattle to run wild and refusing to pay for the forage he leached off the taxpayers.

Ultimately, the BLM sued him in 1998 for trespass, the case being filed in the United States District Court for the District of Nevada before then-United States District Judge Johnny Rawlinson. Bundy lost the case and Judge Rawlinson issued an order requiring Bundy to remove his cattle permanently from the Bunkerville Allotment (hereinafter "the 1998 Order").  Making the same failed claims he continues to make to this day – the federal government cannot own the land – Bundy appealed the 1998 Order to the Ninth Circuit but lost there also.

Undeterred, Bundy simply ignored the 1998 Order, running his cattle as he always had, violating the 1998 Order just as he had all the other rules and regulations governing public lands. In 1999, Judge Rawlinson issued another order, re-affirming the 1998 Order and fining Bundy for each day he refused to remove his cattle.  He ignored that Order just as he had the previous one.

Thereafter, other attempts were made to remove or have Bundy remove his cattle, all to no avail.  The BLM went back to Court in 2012, filing a new lawsuit against Bundy to remove his cattle from the LMNRA and also filing a motion to renew the 1998 Order pertaining to the Bunkerville Allotment.

United States District Judge Lloyd George presided over the 2012 action. As he had before, Bundy claimed that the federal government could not own the land. However, in keeping

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 6

with well-established legal precedent, Judge George – like every other previous court – rejected Bundy's claims in a July 2013 Order and required Bundy to permanently remove his cattle from the LMNRA within 45 days.

The motion in the 1998 action went before United States District Judge Larry Hicks. Like Judge George, Judge Hicks rejected Bundy's claims in an October 2013 Order, re-affirming the 1998 Order and requiring Bundy to remove his cattle from the Bunkerville Allotment within 45 days. The Orders from Judge George and Judge Hicks each authorized the BLM to remove and impound the cattle if Bundy refused to do so, Judge Hicks expressly ordering Bundy not to physically interfere with any seizure or impoundment operation conducted by the BLM.

As before, Bundy refused to remove his cattle. Thus, the 2013 Orders in hand, the BLM commenced impoundment operations beginning around April 5, 2014. From the outset, Bundy interfered. The Superseding Indictment details Bundy's numerous threats to "do whatever it takes" to prevent the BLM from impounding his cattle and the escalating violence and threats of violence he used to impede and disrupt the impoundment, including blocking convoys, assaulting law enforcement officers and terrorizing civilian employees.

Most nefariously – and perhaps most relevant to the detention decision here – Bundy recruited gunmen to come to Nevada to confront the federal officers, issuing calls-to-arms over the internet to anyone who would listen to come to Bundy Ranch to confront the officers who were executing the federal court orders to impound the cattle.

Parker answered that call. He traveled to Nevada with firearms and with the intent to use them against federal law enforcement officers. There is no evidence that he won't answer the call again.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 7

**B.      The April 12, 2014, Armed Assault**

By April 12 hundreds of people, including gunmen, had answered Bundy's calls-to-arms against the BLM.  As the gunmen arrived, Bundy and his co-conspirators organized them into so-called "militia camps," deploying them from there into armed security checkpoints and patrols.

On April 12, Bundy rallied his Followers and commanded them to take his cattle back, unleashing over 400 Followers, including at least 60 of them armed, to converge on and assault the BLM's impoundment site, demanding the release of the impounded cattle corralled there. The Superseding Indictment sets out the nature of the assault that day.  While the government does not intend to repeat those allegations here, it incorporates them by reference and further proffers as follows.

- **The April 12 assault was an extremely violent act.**

As the Court knows, it is a violation of federal law to use a firearm to assault, interfere with or intimidate a federal law enforcement officer.  And contrary to the fiction incanted by Bundy and his Followers to stir up support and pollute the minds of children, there is no First or Second Amendment right, or other right recognized in the law anywhere, that gives anyone the right to use or carry, let alone brandish, raise or point, a firearm in order to assault, intimidate, interfere with or prevent a federal law enforcement officer from performing his or her duties – whether one thinks the officer is acting constitutionally or not.  While that should be obvious to any law abiding citizen, Bundy and his Followers, including Parker, espouse to the contrary.

On April 12, Bundy had mustered more than 60 firearms to assault and intimidate federal law enforcement officers while they were performing their duties. The evidence shows that officers confronted an angry array of more than 270 Followers directly in front of them, their formation being backed up by gunmen brandishing or carrying rifles and firearms among the

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 8

unarmed Followers, or perched on high ground in over-watch positions, or in concealed sniper positions aiming their assault rifles from bridges. The officers guarding the gate that day, almost to a person, thought either they, or unarmed civilians in front of them, or both, were going to be killed or wounded. Many of these officers, some of them combat veterans, remain profoundly affected emotionally by this event to this day. Witnesses have described the level of violence as so intense that something as innocent as the backfire of vehicle, or someone lighting a firecracker, would have set off a firefight between the gunmen and the law enforcement officers.

The Superseding Indictment charges, and the investigation shows, that Bundy was responsible for recruiting gunmen, including Parker. Bundy and his co-conspirators did so by issuing numerous calls to arms, inciting and soliciting others to bring weapons to Bundy Ranch, to show force, to make the BLM back down, to surrender, and other similar exhortations. The justification, according to Bundy and his followers: BLM was acting unconstitutionally in impounding his cattle. In other words, BLM was enforcing the law and Bundy didn't like it – so he organized an armed assault.

- **Bundy, his co-conspirators and Followers have pledged to do it again.**

The evidence shows that this was an unprecedented act. The gunmen traveled great distances in a short period of time, Parker being only one example among many, answering the call to arms, coming from more than ten states to get to Bundy Ranch to confront the BLM, flooding into the Ranch between April 10 and the morning of April 12. The evidence shows that when the gunmen arrived, the conspirators organized them into camps, armed patrols, and security check points.

The evidence shows that Bundy rallied and directed his Followers to get his cattle out of the impoundment site on the morning of April 12. Bundy's son, Ammon, led the assault on one of the entrances to the site. Indicative of his intent that day was his statement to another person

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 9

as he was drove his truck to the impoundment site: "These federal agencies have a lot of power and they are not just going to give that power up. The people just have to take it, I guess."

In the immediate aftermath of the assault and extortion, after having delivered the extortionate demands to the SAC and coercing the officers into leaving by threatening violence, Ammon Bundy was asked whether BLM was gone for good. Ammon responded: "They better be or the people will do it again."

In an interview later in the evening on April 12, Ammon Bundy stated:

> We the people expressed our power and as a result the Sheriff took control of his county. The Sheriff must protect the agency of man. The people have the power -- it's designed that way -- you have the people and then you have the Sheriff. Sovereign citizens on our own land.

Many of these same gunmen who conspired with Bundy and his son to assault the impoundment remain at large and, through Facebook posting and other social media outlets, have pledged to support Bundy again if BLM takes any action against him.

## C.    Post-Assault:  April 13 and thereafter

Immediately after the assault, Bundy and his co-conspirators openly celebrated their use of force, showing the world that not only did they lack remorse for their violent criminal acts – they were proud of them. In an interview posted to the Pete Santilli Show's YouTube channel on or about April 16, 2014, Cliven Bundy was interviewed by an individual named Peter Rense. When asked whether the BLM still had officers in the area, Bundy stated, "We the people and the militia definitely rid this place of any of that kind of influence." *See* https://www.youtube.com/watch?v=dI-3qYTMGgU (last visited February 11, 2016). In the same interview, Bundy expressed dismay that the BLM was allowed to leave with their weapons on April 12: "we haven't won the war, we've just won one chapter of it." *Id.* Bundy's

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 10

characterization of the assault as part of a larger "war" makes clear that his efforts to thwart and interfere with BLM law enforcement officers would carry on.

To that end, Bundy relied on armed individuals who continued to travel to Bundy Ranch in the months after the assault.  Camping in and around what the Bundys designated as "militia camps," these gunmen engaged in reconnaissance missions, manned check points on public roads, and conducted armed patrols of the area around Bundy Ranch to ensure BLM officers were not present and would not return.  Bundy and his conspirators established a firing range on public land which his lead bodyguard used to train other gunmen to protect Bundy and his ill-gotten gains.

On April 17, 2014, a local Channel 8 news reported on the continued armed presence in the area and stated that "Armed protesters continue to surround the Bundy ranch and are even blocking a county road. Some of the supporters attempted Thursday to keep a Channel 8 news crew from entering the area, despite it being a public road. . . . The armed men say they'll be at the site for weeks to come to defend the Bundy family."  The news segment included footage of a Bundy guard blocking access to a public road.

Organized patrols of the public lands continued all through the summer into the fall of 2014.  Additionally, evidence shows that telephone lines with roster information were set up, donation pages on the internet continued to be utilized to solicit funds, and gunmen traveled back and forth from other states to do duty at the Ranch.  The purpose of these missions was to ensure Cliven Bundy was not arrested and that BLM did not return to the public lands either to impound the cattle or for any other purpose.

### D.      Parker's Role in the Conspiracy

Parker was a gunman/sniper in the conspiracy.  Starting on April 8, 2014, Parker began to post messages on Facebook regarding the BLM's impoundment operation in Nevada:  "Got a

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 11

neighbor in some trouble down in Nevada…What are you going to do when the shooting starts…."  On April 11, Parker posted a link on his Facebook page to the article, "Armed Militias Head To Nevada Ranch As Populist Showdown With Federal Government Teeters On."  Parker claims that he decided travel to Nevada after seeing an online video of a federal law enforcement officer tazing co-defendant Ammon Bundy.

Parker and co-defendants Scott Drexler and Steven Stewart left Idaho on April 11 and drove 10 hours straight through to Bundy Ranch, bringing with them assault rifles, handguns, and ammunition.  On April 11 at 9:11 pm, Parker updated his Facebook status with the message: "I'm seeing lots of reports of the cell tower being disable…If this is true they could be trying to stop video getting out… I'm about two hours out and not sure what to expect? Anyone seen any posts from the actual ranch or people at the camp?"

Parker and his group arrived at Bundy Ranch at approximately 2:00 a.m. on April 12. One of the Bundys eventually greeted them and asked if they wanted to camp in the "militia" camp or with the protestors.  The "militia" camp was the designated area for gunmen.  Parker chose to be a gunman and picked the "militia" camp.  Parker, Drexler, and Stewart then went on patrol for two hours.

Later on the morning of April 12, and for the purpose of thwarting the impoundment, Bundy organized and led over 400 Followers to assault the law enforcement officers as they guarded the Impoundment Site, all for the purpose of getting his cattle back.   Parker provided security at the rally before heading to the Impoundment Site to get Bundy's cattle.



After the rally, Parker followed Bundy's order to get his cattle from the officers.  On April 12 at 11:24 a.m., Parker updated his Facebook status with the following: "Bundy gave the sheriff 1 hour to disarm the BLM…he did not reply. We are now going to free the cattle by any means. The sheriff claimed that the blm is standing down but offered no proof this is when Mr. Bundy gave him the 'do it or else.' We will not be lied to."

The evidence shows that as Bundy's Followers in the wash lined up to assault the gate, Parker, and co-defendants Drexler, Stewart, Todd Engel, Richard Lovelein and other gunman took positions on the Interstate 15 bridge overlooking the officers at the gate, brandishing their assault rifles at federal officers.  As Bundy's Followers assaulted the gate in the wash below, Parker took a prone sniper position behind a jersey barrier aiming his assault rifle at federal law enforcement officers, ready to fire on the agents.



Many of these same gunmen who conspired with Bundy and his son to assault the impoundment remain at large and, through Facebook posting and other social media outlets, they have pledged to support Bundy again if law enforcement takes any action against him.

### E.   Post-Assault Conduct by Parker

Immediately after the assault, Parker openly celebrated his role in assaulting and extorting the officers, stating the following to a local reporter:

**Reporter**: Can you tell me who you are and why you are down here real quick?

**Parker**: My name is Eric and we came down here from Idaho

**Reporter**: Are you part of one of the militia groups?

**Parker**: Nah, just independent, a county civil defense unit.

**Reporter**: What does this victory for the Bundys mean you think?

**Parker**:  I think it means a lot but it needs to keep happening.  We need to keep matching a show of force.  There is a rancher in Texas right now under threat from the BLM 90,000 acres on the Red River their trying to take from him right now.   If you're in Texas right now, go there, get on a bridge, show um force.

**Reporter**:  We saw some younger people down there, looked like they might have been children.  Do you think that was wise to have those kids down there, do you think could have turned dangerous?

**Parker**:  That might have been the only thing that kept them from getting gassed.  They threatened to shoot chemicals into that crowd.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 14

**Reporter**:  Do you think it was good to have the kids down there?

**Parker**:  Absolutely!

**Reporte**r: Do you think this could have potentially turned violent?

**Parker**:  Absolutely!



Later in the day**,** Parker responded to a Facebook message asking for any news:  "its over we won…."  On April 13, in response to a Reuters report that a gunman on the bridge named Scott had stated "I'm ready to pull the trigger if fired upon," Parker posted on Drexler's Facebook page, "I'm ready to pull the trigger if fired upon!" Whoever made that quote must have been a bad ass."

After April 12, pictures and videos of Parker aiming his assault rifle at law enforcement went viral both in mainstream media and within the so-called "patriot"  community.  Parker embraced his new found fame and became one of the most infamous non-Bundys who participated in the assault and extortion.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 15

Parker has continuously referenced Bundy Ranch on his Facebook page and routinely changes his profile picture to pictures of himself brandishing and pointing his assault rifle at law enforcement on April 12, 2014.  Below is a picture that Parker commented on within Facebook. The picture, which was posted to numerous websites in the days following the April 12 assault, shows Parker in a sniper position with the words "BE THIS GUY" and "III%". Parker made the following comment on April 15:  "Not sure what to say... if it empowers people it's awesome. . .Hopefully they don't come put a bag over my head..."



On April 19, 2014, Parker posted onto Facebook an article entitled, "this Incredible New Footage Shows how Close Bundy Standoff Came to a Massacre."  On April 21, 2014, a person posted the following question on Parker's Facebook timeline, "Not to sound like a groupie.  Are you the MF'er on the bridge?"  Parker responded, "It was me."

On October 31, 2014, Parker posted this picture on Facebook:



On March 10, 2015, Parker posted this picture and stated that it was "his favorite one:"



On April 11, 2015, Parker posted the following on Facebook in reference to Bundy

Ranch:

> About one year ago, We woke up in the desert and made bacon bagel sandwich's for breakfast after arriving at about 2am we took watch on the gate from 2 till 4am our only interaction with the Militia was that morning at the HQ tent we were told we would escort the Bundies to the stage and keep an eye on the crowd
>
> After that the real patriots went and go the cows back while others stayed at the safety of the stage.

On June 11, 2015, Parker posted this picture:

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 17



On October 8, 2015 Parker posted this picture:



On February 2, 2016, Parker posted this picture celebrating the assault and extortion of

April 12, 2014:



Parker has an unbreakable bond with his co-conspirators that carries on to this day.  On February 11, 2015, after co-defendant Cliven Bundy was arrested, Parker took to Facebook and posted:  "Okay now I'm pissed. They have Cliven."  Parker later reposted the following that Steven Stewart stated on Parker's timeline:  "Cool calm and collected boys… Be smart.  They will use your words against you."

Following his violent conduct at Bundy Ranch, PARKER became one of the founders of the Idaho III% and is currently the group's Vice-President.  The III% motto is "When Tyranny Becomes Law, Rebellion Becomes Duty!"

In April 2015, a year after the assault and extortion at Bundy Ranch, a dispute arose between the BLM and miners in Grants Pass, Oregon at the Sugar Pine Mine. The miners requested outside assistance, to which Idaho III% and various Bundy Ranch veterans, including Parker responded, hoping for another Bundy Ranch.  The government avoided the miners and armed occupants to prevent the creation of another Bundy Ranch.

On April 24, 2015, Parker posted to Facebook entitled "Rally for Sugar Pine Mine Remains Peaceful but BLM Closed Office as Safety Precautions."  Parker then commented:

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 19

"Been here for two weeks helping the community learn how to mount an effective resistance. First Amendment hand in hand with the second."  On April 30, 2015, Parker posted to Facebook the following:  "Get to Grant Pass anyone and everyone.. go! Not a drill breaching the mine now."

In August 2015, Parker participated in what he and others referred to as "Operation Big Sky," which was an event where III% members and others traveled to Lincoln, Montana, with firearms to intimidate the U.S. Forest Service (USFS) to cease regulation of White Hope Mine, a small mining operation.  At the miner's request, Parker and others traveled to Lincoln and established an armed checkpoint on public land leading to the mine.  They also maintained a military style security operation at the mine site and served a "Notice of No Trespass" on USFS, threating to arrest USFS employees and contractors if they set foot on the public land upon which the site sits.  They claimed that "the immediate aim of this operation is to act as a buffer between the miners and any unlawful action by the USFS."

On August 4, 2015, Parker posted the following on his Facebook page in reference to the Operation Big Sky:

> "Well apparently they want to keep doing this. So… what's the answer to the slow boil? … We are currently ramping up this operation with the OathKeepers and Montana III%. Our goal…hold the mine until such time as the owner receives his right to due process….  Show the community how to erect an effective resistance to over stepping bureaucracies and their self-perceived authority.  WE THE PEOPLE WILL NOT BE TERRORIZED. WE WILL STAND TOGETHER WITH OUR NEIGHBORS. WE WILL DEFEND EACH OTHER.

On August 24, 2015, co-defendant Blaine Cooper posted the following picture of Parker on his Facebook page from the Montana Operation.



Cooper also uploaded a video onto the internet discussing the operation. Below is a screen shot showing Parker, Cooper, and Drexler in Montana.



In September 2015, Arizona rancher Lavoy Finicum, who participated in the assault and extortion on April 12, 2014, as well as in the 2016 Oregon occupation discussed below, uploaded videos of himself where he recounts his fight with the BLM over his refusal to pay grazing fees. On September 8, 2015, Parker made the following posting on Facebook in response to the Finicum's situation:

> I stand with the 9th and 10th amendment and if we all have to die to prove that point then God help me.. so be it.  Rumor is it will be the FBI this time running the operations instead of [the SAC] from the BLM. They want to make sure that we can't claim lack of authority.
>
> If you think you can terrorize my countrymen then you will have to shoot me on a bridge and I will not die easy …. We all have to die someday and if we have to die we do it defending our rights.
>
> Organize to defend and when that time comes stand and sing your death song loud brother. III%

Parker later commented on his post stating, "If it pops off the Patriot railroad will be activated and volunteers and donations will be moved across the country."

In December 2015, Parker posted several comments to his Facebook denouncing as unconstitutional the arrest of Schuyler Barbeau for possessing an unregistered firearm.  *See United States v. Barbeau*, CR-15-00391-RAJ, United States District Court for the Western District of Washington.  Barbeau participated in assault and extortion on April 12.  Parker and others interpreted Barbeau's arrest as a "payback" for Bundy Ranch.

On December 7, 2015,  Parker posted the following on his Facebook page:  "ALERT PATRIOT KIDNAPPED BY FBI AND US MARSHALS … He (Barbeau) helped stand down the BLM at Bundy Ranch, the BLM Mine in Oregon, the USFS at the Mine in Montana …"

On December 11, 2015, Parker posted on Facebook a link to an Idaho III% recruitment video entitled "3% of Idaho an Overview" The video prominently features Parker and includes pictures of him assaulting law enforcement officers on April 12, 2014.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 22

https://www.youtube.com/watch?v=ReSuy_nNX_Q&feature=youtu.be

From January 2, 2016 through February 11, 2016, numerous individuals, including Parker's co-defendants, Ammon and Dave Bundy, Ryan Payne, Peter Santilli, Brian Cavalier, Blaine Cooper and Joseph O'Shaughnessy conducted an armed occupation of the Malheur National Wildlife Refuge MNWR, which is owned and managed by the federal government.   In the lead-up to the armed occupation, Parker and others advocated that Oregon ranchers Dwight and Steven Hammond should not turn themselves in to serve a federal prison sentence.  On October 7, 2015, Dwight and Steven Hammond were re-sentenced to serve a mandatory, five-year term of imprisonment and were given a self-surrender date of January 4, 2016.  On December 30, 2015, Parker posted the following on Facebook, "Let's go folks!! I know it's a long way to travel for an event but let's show the Hammonds they don't have to turn themselves in. Maybe they see the support and decide not to."  Parker recently stated that he and the Idaho III% wanted to "put our security team on [Dwight Hammond's] property and not let them take him."  *See* Jason Arment, "Interview with Eric Parker, Part II" (February 29, 2016)

http://thebigsmoke.com/2016/02/29/interview-with-eric-parker-part-ii-the-bird-sanctuary/

Parker and other Idaho III% members traveled to Burns, Oregon, and participated in a January 2, 2016 protest rally in support of the Hammonds.  After the rally, Ammon Bundy, Ryan Payne and others took over the MNWR, proclaiming that it did not belong to the federal government.

On January 7, 2016, the Idaho III% and other militia groups, operating under the Pacific Patriot Network (PPN), issued a press release setting forth "an Immediate Call to Action to secure a perimeter around the Wildlife Refuge, its occupiers, and the citizens of Harney County." The release claimed the purpose of the call to action was "to stand to bear witness and prevent

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 23

any escalation or hostile action from either side.  In the event of inappropriate action, A-Teams will respond accordingly."

Many III% members, including Parker and his president, as well as other militia groups, returned to Oregon under the umbrella of the PPN.   On January 9, numerous people, including Parker in his leadership role, answered the call and showed up at the MNWR heavily armed wearing military style tactical clothing.  The PNN and III% leadership claimed that they would set up a "Perimeter of Protection" around the MNWR.  Parker's image is captured in the below picture on January 9 outside of the MNWR.



A man stands guard after members of the "3% of Idaho" group and several other organizations arrive at the Malheur National Wildlife Refuge on Saturday, Jan. 9. *Rick Bowmer / AP*

PPN and Idaho III% leadership also delivered proposed "Articles of Resolution" to the FBI that they purported would end the occupation.  The terms were that the federal government acknowledge that it was not permitted to own the MNWR under the Constitution, transfer the MNWR to the local county, and open a criminal investigation of the Oregon United States Attorney's Office.  These supposed "demands" were similar to same exhortations used at Bundy Ranch.  In short, the federal government must leave if it wants to avoid an armed confrontation.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 24

On January 24, 2016, Parker posted the following picture onto Facebook, depicting several people who answered the call-to-arms in Oregon with the comment, "where will you be when it all goes hot?  Metaphorical (sic) question of course...."



Also on January 24, 2016, Parker posted the following on Facebook regarding the MNWR occupation:   "If it goes hot they will stop people in route at that time you have a choice to make.  Rights only exist if you draw a line that you are willing to die on."

On January 31, 2016, Oregon State Police observed Parker's truck parked at a local hotel. An officer observed what appeared to be an AK style rifle resting barrel down in plain sight inside the truck.

Parker has also made numerous statements advocating use of force and violence against law enforcement. On July 11, 2015, Parker posted the following picture on Facebook:



On January 29, 2016, Parker posted the following on Facebook:



On February 17, 2016, he posted the following:

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 26



Parker further stated: "if they pull my card these will be available for sale."  Parker's brother

commented:  "Your son is too young to pick up your sword brother if you fall.  I will have blood

for blood."

On September 24, 2015, Parker posted the following on Facebook:

I have the right to oppose an illegal arrest all the way up to the point of defending
my life…. Y'all think by being deputized it will make a difference. False. If you
threaten to kidnap a citizen.. illegally detain US citizen … murder a citizen for not
complying to your unconstitutional demands that citizens should defend his life
the same he would have any kidnap situation.  If you mount up dress up like war
enter a situation with your perceived authority demand compliance or death
drawn down on me I will defend myself so help me God I will defend others III%

On December 14, 2015, Parker posted the following on Facebook:

People are pissed off, I hope the FBI understand there is a wave of anger building
and it's being held back by people who don't want to see the administration get
their way. Violence civil unrest Civil War these things vindicate what they are
saying about us. Puts them in the right and then they drop the hammer.

I guess what I'm saying is when you take political prisoners and allude to charges
of domestic terrorism for use of the First Amendment well we can't hold that
wave back forever.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 27

On August 12, 2014, Parker posted the following message on Facebook:



Most recently, Parker stated the following:

[T]here are things that need to be done right now. Some people have likened it to a cold war for the Bill of Rights, for the Declaration of Independence, and for the Constitution. And the things that need to be done right now is getting involved and making a stand. Finding those situations where people are in the right, with their property rights, and the Constitution is legitimately being violated, and making a hard stand.

"Interview with Eric Parker, Part II" (February 29, 2016)

http://thebigsmoke.com/2016/02/29/interview-with-eric-parker-part-ii-the-bird-sanctuary/

## II.   ARGUMENT

The Bail Reform Act provides that a judicial officer shall detain a defendant pending trial where "no conditions or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e). Detention is appropriate where a defendant poses either a danger to the community or a risk of non-appearance and it is not necessary to prove both.  *See United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).  The Government must establish by clear and convincing evidence

that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant is a risk of non-appearance.  *Id.*

In determining whether pretrial detention is appropriate, Section 3142 provides four factors for the Court to consider: (1) the nature and circumstances of the offense charged, including whether the offense charged is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by the defendant's release.  *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); 18 U.S.C. § 3142(g).

Where, as here, there is probable cause to believe that the defendant has committed an offense under Title 18, United States Code, Section 924(c), the court shall presume, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community.  18 U.S.C. § 3142(e)(3)(B).

At the detention hearing, the Court may properly rely upon a proffer by counsel in determining a defendant's danger to the community or risk of flight.  *See United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986) ("'[T]he government may proceed in a detention hearing by proffer or hearsay.").

A.      **The Offenses Charged Are Based on the Defendant's Violent Assault on Federal Law Enforcement Officers**

Crimes of violence for purposes of the Bail Reform Act include any offense that has as "an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," and is a felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  *See* 18 U.S.C. § 3156(a)(4)(A).  Here, eight of the Counts contained in the Superseding Indictment against Parker are crimes of violence:  assault on a federal officer with a

firearm and deadly weapon; threatening federal law enforcement officers; extortion by force and violence; conspiracy to impede and injury a federal officer; and Section 924(c) counts as to each.

Parker forced federal law enforcement officers to abandon their duties at gunpoint. He believes his lawless act was justified then and he believes it's justified now.  As shown above, he says he would do it again and that he, and others, have some twisted right to supposedly "protect" themselves from law enforcement actions including their own arrest for the crimes they committed.

Parker has shown he is violent and lawless.  As such, he presents a danger to the law enforcement community and, for that matter, anyone who seeks to enforce laws against Parker that Parker believes are "tyrannical."  In Parker's mind, only Parker is the judge what laws apply to him and should the court release him, only Parker will decide when and where those laws will be enforced.

Thus, there are no conditions or combination of conditions that any federal court could impose to protect the community from his lawlessness, whether that community is comprised of the citizens using the public lands or federal law enforcement officers and civilian employees attempting to manage the resources and enforce the laws.  All are subject to Parker's whim and his proclivity to use force and violence to make his point.

**B.    Substantial Evidence Exists Establishing the Defendant's Guilt**

In the immediate aftermath of the April 12 assault, federal law enforcement officers were forced to abandon the impoundment site, precluding them from conducting an immediate investigation.  Out of safety concerns and the need to deescalate the violence and restore order, the remaining local law enforcement officers – who themselves were outnumbered by Bundy's Followers – allowed the gunmen and the conspirators simply to leave the site without making

any arrests, conducting any interviews, taking any statements, or obtaining any identification of the gunmen and other assaulters.

Absent contemporaneous arrests and identifications, the investigation became purely historical in nature.  The presence of many gunmen in and near the area of Bundy Ranch, the armed checkpoints and patrols, the presence of assault weapons in the militia camps, including (by some accounts) a .50 caliber machinegun, further increased the difficulty of conducting a physical investigation of Bundy Ranch or the impoundment site.

All of that said and despite those obstacles, the investigation began the day after the assault and continues to this day, identifying the assaulters, where they came from, how they got to Nevada, their connections to Bundy and others and their role in the assault and the aftermath.

To date, the government has conducted hundreds of witness interviews; executed dozens of search warrants; reviewed, organized and analyzed hundreds of thousands of pages of documents (mostly from social media); reviewed, organized and analyzed thousands of pages of telephone records; and organized, reviewed and analyzed hundreds of hours of audio and video recordings.

In addition to his numerous oral and written statements captured on social media, Parker is captured in photographs and on video assaulting federal officers.  The evidence overwhelmingly establishes that Parker was actively involved as a gunman in the conspiracy to assault and extort federal law enforcement officers conducting impoundment operations on April 12.

## C.   The Defendant's History and Characteristics Demonstrate the Danger and Risk of Non-Appearance He Poses

As discussed above, Parker believes in using guns against law enforcement officers because, according to him they have no authority, further making him an unlikely candidate for

court-ordered supervision.  At a minimum, any release order would require Parker to abide by all laws.  But he has already stated that he does not believe that federal laws apply to him. There is no evidence to suggest that he has changed his mind about that or about his twisted view of the violence at Bundy Ranch, his role in it, or about federal law enforcement officers in general. He has repeatedly stated that he is willing to "die" to supposedly stand up to the federal government. Simply put, Parker believes his has a right to use a gun when he disagrees with the law in order to make a "hard stand."

As described above, Parker is viewed by like-minded individuals as a folk hero and leader.  In his role as vice-president of the Idaho III%, there is no doubt that Parker would be able to rally guns to support his efforts not to comply with court orders.

Parker also faces a potentially lengthy prison sentence if convicted of the current charges, including a consecutive seven year mandatory minimum sentence under 18 U.S.C. 924(c). He has a strong incentive to flee because of the likelihood of a significant prison sentence if he is convicted. *United States v. Townsend*, 897 F.2d at 995 ([F]acing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight.").

### D.      The Defendant Poses A Significant Danger to the Community

Parker's conduct in April, 2014, risked hundreds of people's lives – he aimed his high-power assault rifle at federal officers.  But for the courageous restraint of these officers, this violent assault would likely have met with violent and deadly ends.

Parker continues to put federal law enforcement officers, civilian employees, and community members at risk as demonstrated by his recent participation in the events surrounding the armed occupation of MNWR.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 32

**E.      Only Pretrial Detention Will Reasonably Assure the Safety of Others and the Community and the Defendant's Future Appearance**

There is no evidence to rebut the presumption of detention in this case.  The charges, the evidence, the defendant's history and the danger posed by his continued release all show that detention is warranted here.  As already discussed, any terms of release would have to include that Parker obey all laws.  He cannot follow that – he has stated and demonstrated that will not adhere to laws he does not believe in.

Even the most stringent of conditions are insufficient to assure the safety of the community or the appearance of Parker given that ultimately, they must rely on the Parker's good faith compliance.  *See United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (Noting that although the defendant and pretrial services proposed "strict' conditions, "they contain[ed] one critical flaw. In order to be effective, they depend on [the defendant's] good faith compliance."); *see also Tortora*, 922 F.2d 880, 886 (1st Cir. 1990)  (concluding that an extensive set of release conditions contained "an Achilles' heel ... virtually all of them hinge[d] on the defendant's good faith compliance").   In *Tortora*, an alleged member of a prominent mafia family stood trial for crimes under the racketing and organized crime statute.  The First Circuit considered the elaborate conditions proposed that would restrict any communications with the defendant's cohorts.  Ultimately, the court rejected those conditions, recognizing that "the conditions as a whole are flawed in that their success depends largely on the defendant's good faith-or lack of it. They can be too easily circumvented or manipulated."  *Tortora*, 922 F.2d at 886.

Such considerations are doubly present here, given that Parker's crimes in this case are rooted in his defiance of federal court orders, and that his commitment to flouting federal authority has been maintained in word and deed through the present.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 33

**III.     CONCLUSION**

For the reasons stated herein, the Parker is a danger to the community and a poses a risk of non-appearance and that no condition or combination of conditions will reasonably assure the safety of others or his appearance at future proceedings.  Accordingly, the Government respectfully requests that the Court order Parker detained pending trial.

Dated this 3rd day of March, 2016.


WENDY J. OLSON
UNITED STATES ATTORNEY
By:


*/s/ Justin D. Whatcott*
JUSTIN D. WHATCOTT
Assistant United States Attorney

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 34

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 3, 2016, the foregoing **GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION** was electronically filed with the Clerk of the Court using the CM/ECF system, and that a copy was served on the following parties or counsel by:

| | |
|---|---|
| Randall Barnum<br>Barnum, Howel, and Gunnl<br>380 S. 4th Street, Suite 104<br>Boise, ID 83702<br>randall@barnumhowell.com<br>*Attorney for Eric J. Parker* | ☐ United States Mail, postage prepaid<br>☐ fax<br>☒ ECF filing<br>☐ email |

*/s/ Kate Curtis*
Legal Assistant