WENDY J. OLSON, IDAHO STATE BAR NO. 7634
UNITED STATES ATTORNEY
JUSTIN D. WHATCOTT, IDAHO STATE BAR NO. 6444
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA IV
800 EAST PARK BOULEVARD, SUITE 600
BOISE, ID 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-1413

DANIEL G. BOGDEN
UNITED STATES ATTORNEY
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
ASSISTANT UNITED STATES ATTORNEYS
NADIA J. AHMED
ERIN M. CREEGAN
SPECIAL ASSISTANT UNITED STATES ATTORNEYS
333 LAS VEGAS BLVD. SOUTH, SUITE 5000
LAS VEGAS, NEVADA  89101
PHONE: (702) 388-6336
FAX: (702) 388-6698

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Case No. |
| Plaintiff, | ) |
| | ) |
| v. | ) **GOVERNMENT'S MEMORANDUM IN** |
| | ) **SUPPORT OF PRETRIAL DETENTION** |
| | ) |
| STEVEN A. STEWART, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

The United States, by and through undersigned counsel, respectfully submits this

Memorandum in Support of its Motion for Pretrial Detention pursuant to The Bail Reform Act,

Title 18, United States Code, Section 3142.  As explained herein, the government seeks the

continued pretrial detention of defendant Steven A. Stewart ("Stewart") both as a risk of non-

appearance and as a danger to the safety of others and the community.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 1

Stewart was a gunman/sniper in an unprecedented and extremely violent and massive armed assault on federal officers that occurred on April 12, 2014, while those officers were performing their duties as part of a court-ordered cattle impoundment operation.  But for the courage of the victim officers to back away from their assaulters and abandon the cattle, the actions of Parker and his co-conspirators would have resulted in catastrophic death or injury to the officers and others.  The fact that no one was shot, however, does not mitigate either the level of violence used that day or the intent behind it.



Stewart

Stewart was there because he answered a "call-to-arms" from his co-defendant, Cliven Bundy, to come to Nevada to forcibly stop federal law enforcement officers from the executing court orders to impound his cattle.  In response to the call, Stewart knowingly traveled from Idaho to Nevada with firearms and ammunition and the intent to use them against those law enforcement officers.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 2

Knowingly joining Bundy's conspiracy, Stewart's actions on April 12 betrayed his desire and willingness to kill cops. This alone compels the conclusion that Stewart is a grave danger to the community and a flight risk.

Stewart is currently charged with crimes of violence including assault on a federal law enforcement officer, extortion by force and violence and using and brandishing firearms in connection with crimes of violence under Title 18, United States Code, Section 924(c).  As such, the Bail Reform Act presumes that there are no conditions or combination of conditions that will ensure the safety of the community.  Here, no evidence has been adduced during the investigation of the instant charges that rebuts that presumption.  In fact, all the evidence suggests that Stewart will continue to be a threat to law enforcement officers, will not abide by court orders, and will use threats of violence and violence to ensure that federal laws are not enforced as to him and others.

## I.      FACTS

On March 2, 2016, a federal grand jury seated in the District of Nevada returned a Superseding Criminal Indictment, charging Stewart and 18 other defendants with, among other things, conspiring to assault federal officers, obstruct justice, extort federal officers and use and brandish a firearm in relation to a crime of violence, and the substantive offenses that comprise the objects of the conspiracy, all in violation of Title 18, United States Code, Sections 371; 372; 111(a)(1) and (b); 1503; 1951; and 924(c).

Stewart was arrested on the instant charges on March 3, 2016, pursuant to an arrest warrant issued from the Superseding Indictment.  Based on the evidence adduced from its investigation to date, the government proffers the following in support of its motion for pretrial detention:

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 3

**A.      Background**

Stewart, 32, resides in Hailey, Idaho and it appears he is currently employed.  His

criminal history is unremarkable.  Evidence indicates that Stewart has carried firearms on his

person.

Co-defendant, Cliven Bundy ("Bundy"), 69, is a long-time resident of Bunkerville,

Nevada, living on 160 acres of land in a very rural and sparsely-populated area of the state.

Bundy Ranch, as he refers to the property, is located near the Virgin River a few miles from

where Interstate 15 crosses from Nevada into Arizona, approximately 90 miles northeast of Las

Vegas, Nevada.  Bundy Ranch is surrounded by hundreds of thousands of acres of federal public

lands commonly referred to as the Gold Butte area or the Bunkerville Allotment.  Bundy uses

that entire range of land to graze his cattle unlawfully.

While Bundy claims he is a cattle rancher, his ranching operation – to the extent it can be

called that – is unconventional if not bizarre. Rather than manage and control his cattle, he lets

them run wild on the public lands with little, if any, human interaction until such time when he

traps them and hauls them off to be sold or slaughtered for his own consumption.  He does not

vaccinate or treat his cattle for disease; does not employ cowboys to control and herd them; does

not manage or control breeding; has no knowledge of where all the cattle are located at any given

time; rarely brands them before he captures them; and has to bait them into traps in order to

gather them.

Nor does he bring his cattle off the public lands in the off-season to feed them   when the

already sparse food supply in the desert is even scarcer.  Raised in the wild, Bundy's cattle are

left to fend for themselves year-round, fighting off predators and scrounging for the meager

amounts of food and water available in the difficult and arid terrain that comprises the public

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 4

lands in that area of the country.  Bereft of human interaction, his cattle that manage to survive are wild, mean and ornery. At the time of the events giving rise to the charges, Bundy's cattle numbered over 1,000 head, straying as far as 50 miles from his ranch and into the Lake Mead National Recreation Area ("LMNRA"), getting stuck in mud, wandering onto golf courses, straying onto the freeway – foraging aimlessly and wildly, roaming in small groups over hundreds of thousands of acres of federal lands that exist for the use of the general public for many other types of commercial and recreational uses such as camping, hunting, and hiking.

Bundy claims he has strong anti-federal government views, proclaiming that the federal government cannot own land under the U.S. Constitution.  These are not principled views – and certainly they have no merit legally – but nonetheless serve conveniently as a way for Bundy to somehow try to convince others that he has some reason for acting lawlessly, other than the obvious one: it serves his own ends and benefits him financially.  Untethering himself from the law, Bundy claims he can do with his cattle as he pleases, including not incurring the expenses to manage or control them and not paying for the forage they consume at the expense of federal taxpayers.

Federal law requires any rancher to pay fees and obtain grazing permits to run cattle on public lands.  The evidence suggests that before 1993, Bundy paid fees and kept current the permit his father before him had acquired for grazing cattle on the Bunkerville Allotment. In 1993, however, when BLM restricted both the number of head he could graze and the seasons during which he could graze them, Bundy was faced with the prospect of having to control his herd and bring them off the land during the off-season.  It was then that Bundy claimed that he supposedly "fired the BLM" and refused, from then until to the present, to pay any grazing fees or submit to permits.

It appears that Bundy made some attempt to fight the 1993 restrictions administratively but to no avail.  But despite losing, he continued in his scofflaw ways, ignoring BLM regulations and restrictions pertaining to his use of the public lands, allowing his cattle to run wild and refusing to pay for the forage he leached off the taxpayers.

Ultimately, the BLM sued him in 1998 for trespass, the case being filed in the United States District Court for the District of Nevada before then-United States District Judge Johnny Rawlinson. Bundy lost the case and Judge Rawlinson issued an order requiring Bundy to remove his cattle permanently from the Bunkerville Allotment (hereinafter "the 1998 Order").  Making the same failed claims he continues to make to this day – the federal government cannot own the land – Bundy appealed the 1998 Order to the Ninth Circuit but lost there also.

Undeterred, Bundy simply ignored the 1998 Order, running his cattle as he always had, violating the 1998 Order just as he had all the other rules and regulations governing public lands. In 1999, Judge Rawlinson issued another order, re-affirming the 1998 Order and fining Bundy for each day he refused to remove his cattle.  He ignored that Order just as he had the previous one.

Thereafter, other attempts were made to remove or have Bundy remove his cattle, all to no avail.  The BLM went back to Court in 2012, filing a new lawsuit against Bundy to remove his cattle from the LMNRA and also filing a motion to renew the 1998 Order pertaining to the Bunkerville Allotment.

United States District Judge Lloyd George presided over the 2012 action. As he had before, Bundy claimed that the federal government could not own the land. However, in keeping with well-established legal precedent, Judge George – like every other previous court – rejected Bundy's claims in a July 2013 Order and required Bundy to permanently remove his cattle from the LMNRA within 45 days.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 6

The motion in the 1998 action went before United States District Judge Larry Hicks. Like Judge George, Judge Hicks rejected Bundy's claims in an October 2013 Order, re-affirming the 1998 Order and requiring Bundy to remove his cattle from the Bunkerville Allotment within 45 days.  The Orders from Judge George and Judge Hicks each authorized the BLM to remove and impound the cattle if Bundy refused to do so, Judge Hicks expressly ordering Bundy not to physically interfere with any seizure or impoundment operation conducted by the BLM.

As before, Bundy refused to remove his cattle.  Thus, the 2013 Orders in hand, the BLM commenced impoundment operations beginning around April 5, 2014. From the outset, Bundy interfered.  The Superseding Indictment details Bundy's numerous threats to "do whatever it takes" to prevent the BLM from impounding his cattle and the escalating violence and threats of violence he used to impede and disrupt the impoundment, including blocking convoys, assaulting law enforcement officers and terrorizing civilian employees.

Most nefariously – and perhaps most relevant to the detention decision here – Bundy recruited gunmen to come to Nevada to confront the federal officers, issuing calls-to-arms over the internet to anyone who would listen to come to Bundy Ranch to confront the officers who were executing the federal court orders to impound the cattle.

Stewart answered that call.  He traveled to Nevada with firearms and with the intent to use them against federal law enforcement officers.  There is no evidence that he won't answer the call again.

**B.     The April 12, 2014, Armed Assault**

By April 12 hundreds of people, including gunmen, had answered Bundy's calls-to-arms against the BLM.  As the gunmen arrived, Bundy and his co-conspirators organized them into so-called "militia camps," deploying them from there into armed security checkpoints and patrols.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 7

On April 12, Bundy rallied his Followers and commanded them to take his cattle back, unleashing over 400 Followers, including at least 60 of them armed, to converge on and assault the BLM's impoundment site, demanding the release of the impounded cattle corralled there. The Superseding Indictment sets out the nature of the assault that day.  While the government does not intend to repeat those allegations here, it incorporates them by reference and further proffers as follows.

- **The April 12 assault was an extremely violent act.**

As the Court knows, it is a violation of federal law to use a firearm to assault, interfere with or intimidate a federal law enforcement officer.  And contrary to the fiction incanted by Bundy and his Followers to stir up support and pollute the minds of children, there is no First or Second Amendment right, or other right recognized in the law anywhere, that gives anyone the right to use or carry, let alone brandish, raise or point, a firearm in order to assault, intimidate, interfere with or prevent a federal law enforcement officer from performing his or her duties – whether one thinks the officer is acting constitutionally or not.  While that should be obvious to any law abiding citizen, Bundy and his Followers, including Stewart, espouse to the contrary.

On April 12, Bundy had mustered more than 60 firearms to assault and intimidate federal law enforcement officers while they were performing their duties. The evidence shows that officers confronted an angry array of more than 270 Followers directly in front of them, their formation being backed up by gunmen brandishing or carrying rifles and firearms among the unarmed Followers, or perched on high ground in over-watch positions, or in concealed sniper positions aiming their assault rifles from bridges.  The officers guarding the gate that day, almost to a person, thought either they, or unarmed civilians in front of them, or both, were going to be killed or wounded.  Many of these officers, some of them combat veterans, remain profoundly affected emotionally by this event to this day.  Witnesses have described the level of violence as

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 8

so intense that something as innocent as the backfire of vehicle, or someone lighting a firecracker, would have set off a firefight between the gunmen and the law enforcement officers.

The Superseding Indictment charges, and the investigation shows, that Bundy was responsible for recruiting gunmen, including Stewart.  Bundy and his co-conspirators did so by issuing numerous calls to arms, inciting and soliciting others to bring weapons to Bundy Ranch, to show force, to make the BLM back down, to surrender, and other similar exhortations.  The justification, according to Bundy and his followers:  BLM was acting unconstitutionally in impounding his cattle.  In other words, BLM was enforcing the law and Bundy didn't like it – so he organized an armed assault.

- **Bundy, his co-conspirators and Followers have pledged to do it again.**

The evidence shows that this was an unprecedented act.  The gunmen traveled great distances in a short period of time, Stewart being only one example among many, answering the call to arms, coming from more than ten states to get to Bundy Ranch to confront the BLM, flooding into the Ranch between April 10 and the morning of April 12.  The evidence shows that when the gunmen arrived, the conspirators organized them into camps, armed patrols, and security check points.

The evidence shows that Bundy rallied and directed his Followers to get his cattle out of the impoundment site on the morning of April 12. Bundy's son, Ammon, led the assault on one of the entrances to the site.  Indicative of his intent that day was his statement to another person as he was drove his truck to the impoundment site:  "These federal agencies have a lot of power and they are not just going to give that power up.  The people just have to take it, I guess."

In the immediate aftermath of the assault and extortion, after having delivered the extortionate demands to the SAC and coercing the officers into leaving by threatening violence,

Ammon Bundy was asked whether BLM was gone for good.  Ammon responded:  "They better be or the people will do it again."

In an interview later in the evening on April 12, Ammon Bundy stated:

We the people expressed our power and as a result the Sheriff took control of his county.  The Sheriff must protect the agency of man.  The people have the power -- it's designed that way -- you have the people and then you have the Sheriff. Sovereign citizens on our own land.

Many of these same gunmen who conspired with Bundy and his son to assault the impoundment remain at large and, through Facebook posting and other social media outlets, have pledged to support Bundy again if BLM takes any action against him.

### C.    Post-Assault:  April 13 and thereafter

Immediately after the assault, Bundy and his co-conspirators openly celebrated their use of force, showing the world that not only did they lack remorse for their violent criminal acts – they were proud of them.  In an interview posted to the Pete Santilli Show's YouTube channel on or about April 16, 2014, Cliven Bundy was interviewed by an individual named Peter Rense. When asked whether the BLM still had officers in the area, Bundy stated, "We the people and the militia definitely rid this place of any of that kind of influence."  *See* https://www.youtube.com/watch?v=dI-3qYTMGgU (last visited February 11, 2016).  In the same interview, Bundy expressed dismay that the BLM was allowed to leave with their weapons on April 12:  "we haven't won the war, we've just won one chapter of it."  *Id.*  Bundy's characterization of the assault as part of a larger "war" makes clear that his efforts to thwart and interfere with BLM law enforcement officers would carry on.

To that end, Bundy relied on armed individuals who continued to travel to Bundy Ranch in the months after the assault.  Camping in and around what the Bundys designated as "militia camps," these gunmen engaged in reconnaissance missions, manned check points on public

roads, and conducted armed patrols of the area around Bundy Ranch to ensure BLM officers were not present and would not return.  Bundy and his conspirators established a firing range on public land which his lead bodyguard used to train other gunmen to protect Bundy and his ill-gotten gains.

On April 17, 2014, a local Channel 8 news reported on the continued armed presence in the area and stated that "Armed protesters continue to surround the Bundy ranch and are even blocking a county road. Some of the supporters attempted Thursday to keep a Channel 8 news crew from entering the area, despite it being a public road. . . . The armed men say they'll be at the site for weeks to come to defend the Bundy family."  The news segment included footage of a Bundy guard blocking access to a public road.

Organized patrols of the public lands continued all through the summer into the fall of 2014.  Additionally, evidence shows that telephone lines with roster information were set up, donation pages on the internet continued to be utilized to solicit funds, and gunmen traveled back and forth from other states to do duty at the Ranch.  The purpose of these missions was to ensure Cliven Bundy was not arrested and that BLM did not return to the public lands either to impound the cattle or for any other purpose.

### D.      Stewart's Role in the Conspiracy

Stewart was a gunman/sniper in the conspiracy.  Starting on April 10, 2014, Stewart began to post messages regarding the BLM's impoundment operation in Nevada.  For example, Stewart posted the link onto Facebook: "Last Man Standing. Rancher: armed feds are surrounding my farm" and commented "Seriously."  On April 11, Stewart posted the following link on Facebook:  "What does tyranny look like? This is it. CALL TO ARMS!!! All Minute Men and Militiamen in Nevada should go support Mr. Bundy and when they ask where the

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 11

Second American Revolution started 'we will say on a cattle ranch in the Nevada desert.'"
Stewart commented, "I feel like crap that I'm not already there."

Stewart and co-defendants Eric Parker and Scott Drexler left Idaho on April 11 and drove 10 hours straight through to Bundy Ranch, bringing with them assault rifles, handguns, and ammunition.  On April 11 at 12:25 p.m., Stewart updated his Facebook status with the message: "Headed to Nevada. Going to stand up with my fellow countrymen against a corrupt government!!"

Stewart and his group arrived at Bundy Ranch at approximately 2:00 a.m. on April 12. One of the Bundys eventually greeted them and asked if they wanted to camp in the "militia" camp or with the protestors.  The "militia" camp was the designated area for gunmen.  Stewart chose to be a gunman and picked the "militia" camp.  Stewart, Parker and Drexler then went on patrol for two hours.

Later on the morning of April 12, and for the purpose of thwarting the impoundment, Bundy organized and led over 400 Followers to assault the law enforcement officers as they guarded the Impoundment Site, all for the purpose of getting his cattle back.   Stewart provided security at the rally before heading to the Impoundment Site to get Bundy's cattle.



After the rally, Stewart followed Bundy's order to get his cattle from the officers.  On April 12 at 11:24 a.m., Parker updated his Facebook status with the following: "Bundy gave the sheriff 1 hour to disarm the BLM…he did not reply. We are now going to free the cattle by any means. The sheriff claimed that the blm is standing down but offered no proof this is when Mr. Bundy gave him the 'do it or else.' We will not be lied to."

The evidence shows that as Bundy's Followers in the wash lined up to assault the gate, Stewart, and co-defendants Parker, Drexler, Todd Engel, Richard Lovelein and other gunman took positions on the Interstate 15 bridge overlooking the officers at the gate, brandishing their assault rifles at federal officers.  As Bundy's Followers assaulted the gate in the wash below, Parker and Drexler prone sniper positions behind a jersey barrier aiming their assault rifles at federal law enfacement officers, ready to fire on the agents.  Stewart continued to brandish his firearm and acted as a spotter for Parker.

Many of these same gunmen who conspired with Bundy and his son to assault the impoundment remain at large and, through Facebook posting and other social media outlets, they have pledged to support Bundy again if law enforcement takes any action against him.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 13

**E.      Post-Assault Conduct by Stewart**

Immediately after the assault, Stewart openly celebrated his role in assaulting and

extorting the officers.  Here Stewart can be seen standing on the bridge, along with Parker,

Drexler, and Lovelein, next to a sign stating "The West Has Now Been Won."



Parker, who was standing next Stewart on the bridge, stated the following to a local

reporter:

**Reporter**:  Can you tell me who you are and why are you down here real quick?

**Parker**:  My name is Eric and we came down here from Idaho

**Reporter**:  Are you part of one of the militia groups?

**Parker**:  Nah, just independent, a county civil defense unit.

**Reporter**:  What does this victory for the Bundys mean you think?

**Parker**:   I think it means a lot but it needs to keep happening.   We need to keep matching a show of force.  There is a rancher in Texas right now under threat from the BLM 90,000 acres on the Red River their trying to take from him right now.   If you're in Texas right now, go there, get on a bridge, show um force.

**Reporter**:  We saw some younger people down there, looked like they might have been children.  Do you think that was wise to have those kids down there, do you think could have turned dangerous?

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 14

**Parker**:  That might have been the only thing that kept them from getting gassed.  They threatened to shoot chemicals into that crowd.

**Reporter**:  Do you think it was good to have the kids down there?

**Parker**:  Absolutely!

**Reporte**r: Do you think this could have potentially turned violent?

**Parker**:  Absolutely!



STEWART posted a photo of men on horseback riding under the Interstate underpass and commented "Going to get the cattle back."



On April 12 Stewart shared a link on Facebook via Parker titled "SHOCK: Clark County Official: Bundy Ranch Supporters 'Better Have Funeral Plans'" to which STEWART commented, "We are completely ready."

On April 12, 2104, Stewart uploaded a two minute video onto his Facebook page. The video appears to be taken with phone and shows BLM vehicles retreating from the Impound Site on April 12, 2014 after the assault. A male, presumably Stewart provides the following commentary.

> "See you later, by guys by guys…. Shut it down shut it down. Give us the cows back…. These are the people that decided to fight against us instead of defending us. They work on the other side like that guy (the camera captures a local police officer)…. We were going to be martyrs if they wanted to continue this. You had so many more people than we did too… It's got to be so uncomfortable. Send the losers packing."

Soon after the April 12 assault, pictures and videos of people, including Stewart, Parker, and Drexler, brandishing and aiming their assault rifles at law enforcement went viral both in mainstream media and within the so-called "patriot" community. Later in the day on April 12, Stewart updated his Facebook status: "Everyone look at fox news online. I'm here eric is on the

front page." Later, he posted a link to FoxNews.com and commented, "Made it on the top page today. Look."

On April 19, 2104, Stewart updated his Facebook status:  "I am a sovereign citizen."

On April 26, 2014, Stewart updated his Facebook status:  "People don't know how personal this is to me.  I work in a meat department and was just asked if the price of beef went up because of Bundy.  I know they don't know so I did not yell at them but man am I pissed off."

On July 18, 2014, Stewart updated his Facebook status:  "Defend the Constitution! Overthrow those who seek to pervert and interpret it. It's a straightforward document, not up for debate."

On September 16, 2014, Eric Parker posted the following on Facebook:

That's what I kept saying when people were calling me the Bundy sniper... my buddy Steven Stewart had to relay to me what what was going on through Binoculars not much good at that distance with open sights. .. now Steve he's got balls head up above that concrete telling me exactly what they were doing after the snipers had been green lighted.

Parker's admission is supported by the following picture with shows Stewart and Parker during the April 12, 2014 assault.



Stewart has not been as brash on social media in discussing his role at the April 12, 2014 assault as his close co-defendants Parker and Drexler.  But Stewart is still monitoring the law enforcement response.  On February 11, 2015, after co-defendant Cliven Bundy was arrested, Eric Parker took to Facebook and posted:  "Okay now I'm pissed. They have Cliven."  Parker later posted:  "Cool calm and collected boys… Be smart.  They will use your words against you."  Shortly thereafter, Stewart posted the follwing onto Parker's Facebook page:  "Cool calm and collected boys… Be smart.  They will use your words against you."

## II.   ARGUMENT

The Bail Reform Act provides that a judicial officer shall detain a defendant pending trial where "no conditions or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  Detention is appropriate where a defendant poses either a danger to the community or a risk of non-appearance and it is not necessary to prove both.  *See United States v. Motamedi*, 767 F.2d

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 18

1403, 1406 (9th Cir. 1985).  The Government must establish by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant is a risk of non-appearance.  *Id.*

In determining whether pretrial detention is appropriate, Section 3142 provides four factors for the Court to consider: (1) the nature and circumstances of the offense charged, including whether the offense charged is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by the defendant's release.  *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); 18 U.S.C. § 3142(g).

Where, as here, there is probable cause to believe that the defendant has committed an offense under Title 18, United States Code, Section 924(c), the court shall presume, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community.  18 U.S.C. § 3142(e)(3)(B).

At the detention hearing, the Court may properly rely upon a proffer by counsel in determining a defendant's danger to the community or risk of flight.  *See United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986) ("'[T]he government may proceed in a detention hearing by proffer or hearsay.")

A.      **The Offenses Charged Are Based on the Defendant's Violent Assault on Federal Law Enforcement Officers**

Crimes of violence for purposes of the Bail Reform Act include any offense that has as "an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," and is a felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  *See* 18 U.S.C. § 3156(a)(4)(A).  Here, eight of the Counts contained in the

Superseding Indictment against Stewart are crimes of violence:  assault on a federal officer with a firearm and deadly weapon; threatening federal law enforcement officers; extortion by force and violence; conspiracy to impede and injury a federal officer; and Section 924(c) counts as to each.

Stewart forced federal law enforcement officers to abandon their duties at gunpoint. He believes his lawless act was justified then and he believes it's justified now.  As shown above, he says he would do it again and that he, and others, have some twisted right to supposedly "protect" themselves from law enforcement actions including their own arrest for the crimes they committed.

Stewart has shown he is violent and lawless.  As such, he presents a danger to the law enforcement community and, for that matter, anyone who seeks to enforce laws against Stewart that Stewart believes are "tyrannical."  In Stewart mind, only Stewart is the judge what laws apply to him and should the court release him, only Stewart will decide when and where those laws will be enforced.

Thus, there are no conditions or combination of conditions that any federal court could impose to protect the community from his lawlessness, whether that community is comprised of the citizens using the public lands or federal law enforcement officers and civilian employees attempting to manage the resources and enforce the laws.  All are subject to Stewart's whim and his proclivity to use force and violence to make his point.

**B.      Substantial Evidence Exists Establishing the Defendant's Guilt**

In the immediate aftermath of the April 12 assault, federal law enforcement officers were forced to abandon the impoundment site, precluding them from conducting an immediate investigation.  Out of safety concerns and the need to deescalate the violence and restore order, the remaining local law enforcement officers – who themselves were outnumbered by Bundy's

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 20

Followers – allowed the gunmen and the conspirators simply to leave the site without making any arrests, conducting any interviews, taking any statements, or obtaining any identification of the gunmen and other assaulters.

Absent contemporaneous arrests and identifications, the investigation became purely historical in nature.  The presence of many gunmen in and near the area of Bundy Ranch, the armed checkpoints and patrols, the presence of assault weapons in the militia camps, including (by some accounts) a .50 caliber machinegun, further increased the difficulty of conducting a physical investigation of Bundy Ranch or the impoundment site.

All of that said and despite those obstacles, the investigation began the day after the assault and continues to this day, identifying the assaulters, where they came from, how they got to Nevada, their connections to Bundy and others and their role in the assault and the aftermath.

To date, the government has conducted hundreds of witness interviews; executed dozens of search warrants; reviewed, organized and analyzed hundreds of thousands of pages of documents (mostly from social media); reviewed, organized and analyzed thousands of pages of telephone records; and organized, reviewed and analyzed hundreds of hours of audio and video recordings.

In addition to his oral and written statements captured on social media, Stewart is captured in photographs and on video assaulting federal officers.  The evidence overwhelmingly establishes that Stewart was actively involved as a gunman in the conspiracy to assault and extort federal law enforcement officers conducting impoundment operations on April 12.

### C.   The Defendant's History and Characteristics Demonstrate the Danger and Risk of Non-Appearance He Poses

Stewart has used guns against law enforcement officers and stated that he would have been a "martyr" on April 12, 2104, further making him an unlikely candidate for court-ordered

supervision.  At a minimum, any release order would require Parker to abide by all laws.  There is no evidence to suggest that he has changed his mind about that or about his twisted view of the violence at Bundy Ranch, his role in it, or about federal law enforcement officers in general.  Simply put, Stewart believes his has a right to use a gun when he disagrees with the law.

Stewart also faces a potentially lengthy prison sentence if convicted of the current charges, including a consecutive seven year mandatory minimum sentence under 18 U.S.C. 924(c). He has a strong incentive to flee because of the likelihood of a significant prison sentence if he is convicted. *United States v. Townsend*, 897 F.2d at 995 ([F]acing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight.").

> **D.**     **The Defendant Poses A Significant Danger to the Community**

Stewart's conduct in April, 2014, risked hundreds of people's lives – he assaulted federal officers using his high-power assault rifle.  But for the courageous restraint of these officers, this violent assault would likely have met with violent and deadly ends.

There is simply no evidence to suggest that Stewart will not put federal law enforcement officers, civilian employees, and community members at risk as again just like he did on April 12, 2104.

> **E.**     **Only Pretrial Detention Will Reasonably Assure the Safety of Others and the Community and the Defendant's Future Appearance**

There is no evidence to rebut the presumption of detention in this case.  The charges, the evidence, the defendant's history and the danger posed by his continued release all show that detention is warranted here.  As already discussed, any terms of release would have to include that Stewart obey all laws.  He cannot follow that – he has stated and demonstrated that will not adhere to laws he does not believe in.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 22

Even the most stringent of conditions are insufficient to assure the safety of the community or the appearance of Stewart given that ultimately, they must rely on the Stewart's good faith compliance.  *See United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (Noting that although the defendant and pretrial services proposed "strict' conditions, "they contain[ed] one critical flaw. In order to be effective, they depend on [the defendant's] good faith compliance."); *see also Tortora*, 922 F.2d 880, 886 (1ˢᵗ Cir. 1990)  (concluding that an extensive set of release conditions contained "an Achilles' heel ... virtually all of them hinge[d] on the defendant's good faith compliance").   In *Tortora*, an alleged member of a prominent mafia family stood trial for crimes under the racketing and organized crime statute.  The First Circuit considered the elaborate conditions proposed that would restrict any communications with the defendant's cohorts.  Ultimately, the court rejected those conditions, recognizing that "the conditions as a whole are flawed in that their success depends largely on the defendant's good faith-or lack of it. They can be too easily circumvented or manipulated."  *Tortora*, 922 F.2d at 886.

Such considerations are doubly present here, given that Stewart's crimes in this case are rooted in his defiance of federal court orders, and that his commitment to flouting federal authority has been maintained in word and deed through the present.

**III.    CONCLUSION**

For the reasons stated herein, Stewart is a danger to the community and a poses a risk of non-appearance and that no condition or combination of conditions will reasonably assure the

safety of others or his appearance at future proceedings.  Accordingly, the Government

respectfully requests that the Court order Stewart detained pending trial.

Dated this 3rd day of March, 2016.


WENDY J. OLSON
UNITED STATES ATTORNEY
By:


*/s/ Justin D. Whatcott*
JUSTIN D. WHATCOTT
Assistant United States Attorney


CERTIFICATE OF SERVICE

I  HEREBY  CERTIFY  that  on  March  3,  2016,  the  foregoing  **GOVERNMENT'S**

**MEMORANDUM  IN  SUPPORT  OF  PRETRIAL  DETENTION**  was  electronically  filed

with  the  Clerk  of  the  Court  using  the  CM/ECF  system,  and  that  a  copy  was  served  on  the

following parties or counsel by:

| | |
|---|---|
| Daniel Skinner<br>Cantrill, Skinner, Lewis, Casey, & Sorensen<br>PO Box 359<br>Boise, ID 83701<br>danskinner@cssklaw.com<br>*Attorney for Steven A. Stewart* | ☐ United States Mail, postage prepaid<br><br>☐ fax<br><br>☒ ECF filing<br><br>☐ email |


*/s/ Kate Curtis*
Legal Assistant


GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 24