WENDY J. OLSON, IDAHO STATE BAR NO. 7634
UNITED STATES ATTORNEY
JUSTIN D. WHATCOTT, IDAHO STATE BAR NO. 6444
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA IV
800 EAST PARK BOULEVARD, SUITE 600
BOISE, ID 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-1413

DANIEL G. BOGDEN
UNITED STATES ATTORNEY
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
ASSISTANT UNITED STATES ATTORNEYS
NADIA J. AHMED
ERIN M. CREEGAN
SPECIAL ASSISTANT UNITED STATES ATTORNEYS
333 LAS VEGAS BLVD. SOUTH, SUITE 5000
LAS VEGAS, NEVADA  89101
PHONE: (702) 388-6336
FAX: (702) 388-6698

## UNITED STATES DISTRICT COURT
### DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Case No. |
| Plaintiff, | ) |
| | ) |
| v. | ) **GOVERNMENT'S MEMORANDUM IN** |
| | ) **SUPPORT OF PRETRIAL DETENTION** |
| TODD ENGEL, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

The United States, by and through undersigned counsel, respectfully submits this

Memorandum in Support of its Motion for Pretrial Detention pursuant to The Bail Reform Act,

Title 18, United States Code, Section 3142.  As explained herein, the government seeks the

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 1

continued pretrial detention of defendant Todd Engel ("Engel") both as a risk of non-appearance and as a danger to the safety of others and the community.

Engel was a gunman/sniper in an unprecedented and extremely violent and massive armed assault on federal officers that occurred on April 12, 2014, while those officers were performing their duties as part of a court-ordered cattle impoundment operation. But for the courage of the victim officers to back away from their assaulters and abandon the cattle, the actions of Engel and his co-conspirators would have resulted in catastrophic death or injury to the officers and others. The fact that no one was shot, however, does not mitigate either the level of violence used that day or the intent behind it.



Engel was there because he answered a "call-to-arms" from his co-defendant, Cliven Bundy, to come to Nevada to forcibly and violently stop federal law enforcement officers from

the executing court orders to impound his cattle.  In response to the call, Engel knowingly traveled from Idaho to Nevada with firearms and ammunition and the intent to use them against those law enforcement officers.

Knowingly joining Bundy's conspiracy, Engel's actions on April 12 betrayed his desire and willingness to kill cops.  This alone compels the conclusion that he is a grave danger to the community and a flight risk.

However, Engel is currently charged with crimes of violence including assault on a federal law enforcement officer, extortion by force and violence and using and brandishing firearms in connection with crimes of violence under Title 18, United States Code, Section 924(c).  As such, the Bail Reform Act presumes that there are no conditions or combination of conditions that will ensure the safety of the community.  Here, no evidence has been adduced during the investigation of the instant charges that rebuts that presumption.  In fact, all the evidence suggests that Engel will continue to be a threat to law enforcement officers, will not abide by court orders, and will use threats of violence and violence to ensure that federal laws are not enforced as to him and others.

## I.      FACTS

Engel was indicted by a federal grand jury sitting in the District of Nevada on March 2, 2016. He was charged with conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, conspiracy to injure or impede a federal officer, in violation of 18 U.S.C. § 372, assault on a federal officer with a deadly weapon, in violation of 18 U.S.C. § 111, threatening a federal law enforcement officer, in violation of 18 U.S.C. § 115, obstruction of justice, in violation of 18 U.S.C. § 1503, interference with interstate commerce by extortion, in violation of 18 U.S.C. § 1951, and four counts  of using or carrying a firearm in relation to a

crime of violence, in violation of 18 U.S.C. § 924(c).  He was arrested on _____, pursuant to a warrant issued from the Superseding Indictment.

Based on the evidence adduced from its investigation to date, the government proffers the following in support of its motion for pretrial detention:

**A.      Background**

Engel, 49, lives in a remote area of Idaho.  His criminal history is unremarkable but for a smattering of fairly-aged misdemeanor arrests and convictions.

His co-defendant, Cliven Bundy, 69, is a long-time resident of Bunkerville, Nevada, living on 160 acres of land in a very rural and sparsely-populated area of the state. Bundy Ranch, as he refers to the property, is located near the Virgin River a few miles from where Interstate 15 crosses from Nevada into Arizona, approximately 90 miles northeast of Las Vegas, Nevada. Bundy Ranch is surrounded by hundreds of thousands of acres of federal public lands commonly referred to as the Gold Butte area or the Bunkerville Allotment.  Bundy uses that entire range of land to graze his cattle unlawfully.

Bundy claims he has strong anti-federal government views, proclaiming that the federal government cannot own land under the U.S. Constitution.  These are not principled views – and certainly they have no merit legally – but nonetheless serve conveniently as a way for Bundy to somehow try to convince others that he has some reason for acting lawlessly, other than the obvious one: it serves his own ends and benefits him financially.  Untethering himself from the law, Bundy claims he can do with his cattle as he pleases, including not incurring the expenses to manage or control them and not paying for the forage they consume at the expense of federal taxpayers.

Federal law requires any rancher to pay fees and obtain grazing permits to run cattle on public lands. The evidence suggests that before 1993, Bundy paid fees and kept current the permit his father before him had acquired for grazing cattle on the Bunkerville Allotment. In 1993, however, when BLM restricted both the number of head he could graze and the seasons during which he could graze them, Bundy was faced with the prospect of having to control his herd and bring them off the land during the off-season. It was then that Bundy claimed that he supposedly "fired the BLM" and refused, from then until to the present, to pay any grazing fees or submit to permits.

It appears that Bundy made some attempt to fight the 1993 restrictions administratively but to no avail. But despite losing, he continued in his scofflaw ways, ignoring BLM regulations and restrictions pertaining to his use of the public lands, allowing his cattle to run wild and refusing to pay for the forage he leached off the taxpayers.

Ultimately, the BLM sued him in 1998 for trespass, the case being filed in the United States District Court for the District of Nevada before then-United States District Judge Johnny Rawlinson. Bundy lost the case and Judge Rawlinson issued an order requiring Bundy to remove his cattle permanently from the Bunkerville Allotment (hereinafter "the 1998 Order"). Making the same failed claims he continues to make to this day – the federal government cannot own the land – Bundy appealed the 1998 Order to the Ninth Circuit but lost there also.

Undeterred, Bundy simply ignored the 1998 Order, running his cattle as he always had, violating the 1998 Order just as he had all the other rules and regulations governing public lands. In 1999, Judge Rawlinson issued another order, re-affirming the 1998 Order and fining Bundy for each day he refused to remove his cattle. He ignored that Order just as he had the previous one.

Thereafter, other attempts were made to remove or have Bundy remove his cattle, all to no avail. The BLM went back to Court in 2012, filing a new lawsuit against Bundy to remove his cattle from the LMNRA and also filing a motion to renew the 1998 Order pertaining to the Bunkerville Allotment.

United States District Judge Lloyd George presided over the 2012 action. As he had before, Bundy claimed that the federal government could not own the land. However, in keeping with well-established legal precedent, Judge George – like every other previous court – rejected Bundy's claims in a July 2013 Order and required Bundy to permanently remove his cattle from the LMNRA within 45 days.

The motion in the 1998 action went before United States District Judge Larry Hicks. Like Judge George, Judge Hicks rejected Bundy's claims in an October 2013 Order, re-affirming the 1998 Order and requiring Bundy to remove his cattle from the Bunkerville Allotment within 45 days. The Orders from Judge George and Judge Hicks each authorized the BLM to remove and impound the cattle if Bundy refused to do so, Judge Hicks expressly ordering Bundy not to physically interfere with any seizure or impoundment operation conducted by the BLM.

As before, Bundy refused to remove his cattle. Thus, the 2013 Orders in hand, the BLM planned for and commenced impoundment operations beginning around April 5, 2014. From the outset, Bundy interfered. The Superseding Indictment details Bundy's numerous threats to "do whatever it takes" to prevent the BLM from impounding his cattle and the escalating violence and threats of violence he used to impede and disrupt the impoundment, including blocking convoys, assaulting law enforcement officers and terrorizing civilian employees.

Most nefariously – and perhaps most relevant to the detention decision here – Bundy recruited gunmen to come to Nevada to confront the federal officers, issuing calls-to-arms over

the internet to anyone who would listen to come to Bundy Ranch to confront the officers who were executing the federal court orders to impound the cattle.

Engel answered that call. He traveled to Nevada with firearms and with the intent to use them against federal law enforcement officers. There is no evidence that he won't answer the call again.

**B.      The April 12, 2014, Armed Assault**

By April 12 hundreds of people, including gunmen, had answered Bundy's calls-to-arms against law enforcement officers. As the gunmen arrived, Bundy and his co-conspirators organized them into so-called "militia camps," deploying them from there into armed security checkpoints and patrols.

On April 12, Bundy rallied his gunmen and other Followers and commanded them to take his cattle back, unleashing over 400 Followers, including at least 60 of them armed, to converge on and assault the BLM's impoundment site, demanding the release of the impounded cattle corralled there. The Superseding Indictment sets out the nature of the assault that day. While the government does not intend to repeat those allegations here, it incorporates them by reference and further proffers as follows.

•      **The April 12 assault was an extremely violent act.**

As the Court knows, it is a violation of federal law to use a firearm to assault, interfere with or intimidate a federal law enforcement officer. And contrary to the fiction incanted by Bundy and his Followers to stir up support and pollute the minds of children, there is no First or Second Amendment right, or other right recognized in the law anywhere, that gives anyone the right to use or carry, let alone brandish, raise or point, a firearm in order to assault, intimidate, interfere with or prevent a federal law enforcement officer from performing his or her duties –

whether one thinks the officer is acting constitutionally or not.  While that should be obvious to any law abiding citizen, Bundy and his Followers, including Engel, espouse to the contrary.

On April 12, Bundy had mustered more than 60 firearms to assault and intimidate federal law enforcement officers while they were performing their duties. The evidence shows that officers confronted an angry array of more than 270 Followers directly in front of them, their formation being backed up by gunmen brandishing or carrying rifles and firearms in the wash, or perched on high ground in over-watch positions, or in concealed sniper positions aiming their assault rifles from bridges.  The officers guarding the gate that day, almost to a person, thought either they, or unarmed civilians in front of them, or both, were going to be killed or wounded. Many of these officers, some of them combat veterans, remain profoundly affected emotionally by this event to this day.  Witnesses have described the level of violence as so intense that something as innocent as the backfire of vehicle, or someone lighting a firecracker, would have set off a firefight between the gunmen and the law enforcement officers.

The Superseding Indictment charges, and the investigation shows, that Bundy was responsible for recruiting gunmen, including Engel.  Bundy and his co-conspirators did so by issuing numerous calls to arms, inciting and soliciting others to bring weapons to Bundy Ranch, to show force, to make the BLM back down, to surrender, and other similar exhortations.  The justification, according to Bundy and his followers:  BLM was acting unconstitutionally in impounding his cattle.  In other words, BLM was enforcing the law and Bundy didn't like it – so he organized an armed assault.

- **Bundy, his co-conspirators and Followers have pledged to do it again.**

The evidence shows that this was an unprecedented act.  The gunmen traveled great distances in a short period of time, Engel being only one example among many, answering the

call to arms, coming from more than ten states to get to Bundy Ranch to confront the BLM, flooding into the Ranch between April 10 and the morning of April 12. The evidence shows that when the gunmen arrived, the conspirators organized them into camps, armed patrols, and security check points.

The evidence shows that Bundy rallied and directed his Followers to get his cattle out of the impoundment site on the morning of April 12. Bundy's son, Ammon, led the assault on one of the entrances to the site. Indicative of his intent that day was his statement to another person as he was drove his truck to the impoundment site: "These federal agencies have a lot of power and they are not just going to give that power up. The people just have to take it, I guess."

In the immediate aftermath of the assault and extortion, after having delivered the extortionate demands to the SAC and forcing the officers into leaving by threatening violence, Ammon Bundy was asked whether BLM was gone for good. Ammon responded: "They better be or the people will do it again."

In an interview later in the evening on April 12, Ammon Bundy stated:

> We the people expressed our power and as a result the Sheriff took control of his county. The Sheriff must protect the agency of man. The people have the power -- it's designed that way -- you have the people and then you have the Sheriff. Sovereign citizens on our own land.

Many of these same gunmen who conspired with Bundy and his son to assault the impoundment remain at large and, through Facebook posting and other social media outlets, have pledged to support Bundy again if BLM takes any action against him. There is no evidence to suggest that Bundy or any of his co-defendants could not quickly muster his gunmen again if any law enforcement action is taken against him.

### C.   Post-Assault:  April 13 and thereafter

Immediately after the assault, Bundy openly celebrated his role in driving the BLM out of the area.  In an interview posted to the Pete Santilli Show's YouTube channel on or about April 16, 2014, Cliven Bundy was interviewed by an individual named Peter Rense.  When asked whether the BLM still had officers in the area, Bundy stated, "We the people and the militia definitely rid this place of any of that kind of influence."  *See* https://www.youtube.com/watch?v=dI-3qYTMGgU (last visited February 11, 2016).  In the same interview, Bundy expressed dismay that the BLM was allowed to leave with their weapons on April 12: "we haven't won the war, we've just won one chapter of it."  *Id.*  Bundy's characterization of the assault as part of a larger "war" makes clear that his efforts to thwart and interfere with BLM law enforcement officers would carry on.

To that end, Bundy relied on armed individuals who continued to travel to Bundy Ranch in the months after the assault.  These individuals, camping in and around what the Bundys designated as "militia camps," engaged in reconnaissance missions, manned check points on public roads, and conducted armed patrols of the area around Bundy Ranch to ensure BLM officers were not present and would not return.  Bundy and his conspirators established a firing range on public land which his lead bodyguard used to train other gunmen to protect Bundy and his ill-gotten gains.

Bundy's gunmen also took up over-watch positions along State Route 170, the main artery into the town of Bunkerville, and attempted to threaten their way into public facilities in the neighboring town of Mesquite, creating an environment of fear for these communities.

Organized patrols of the public lands continued all through the summer into the fall of 2014.  Additionally, evidence shows that telephone lines with roster information were set up,

donation pages on the internet continued to be utilized to solicit funds, and gunmen traveled back and forth from other states to do duty at the Ranch. The purpose of these missions was to ensure Cliven Bundy was not arrested and that BLM did not return to the public lands either to impound the cattle or for any other purpose.

### D.     Engel's Role in the Conspiracy

Engel was a gunman who became a sniper on a bridge during the assault and extortion of the federal officers at the Impoundment Site. Numerous photographs and videos depict him as such.

Engel was proud of his role as a gunman. He told others of his intent to forcefully confront federal law enforcement officer on April 12 and of this intent to do it again if the opportunity presented itself.

Beginning on April 8, 2014, Engel commented on a posting about the Bundy Ranch on the Facebook page "Nation in Distress." In response to statements about "armed feds preparing for a showdown" with Bundy, Engel commented, "Oiling bolt. Loading magazines!"—meaning that he was preparing an assault rifle for use. Also on April 8, 2014, Engel posted a video to Facebook and comments, "Must Watch! They've taken his cattle and then they took his son! If they want war, let it begin here. Oiling bolt, loading magazines!"—again referring to preparing an assault rifle for use. Toll records and Facebook postings show that on April 9 and 10, 2014 Engel contacted other co-conspirators. By April 11, he was on his way from Idaho to Nevada to join his co-conspirators.

His intent was clear. On April 11, 2014, Engel commented on a photo on Facebook, "I'm 20 miles from ruby ridge. Truck loaded and heading to Nevada! Pray for peace prepare for war." Further, Engel posted: "I'll be boots on the ground at4am"; "I am ready to go to Nevada […]. I

want to plow through all off the BLM's barricades and set fire to them. Reminds me of ruby ridge and Waco."; "Are there fed roadblocks? I'll be there in 5 hours, and I won't take kindly to an illegal search. Please advise."—all referring to the use of force against the federal government and casting the situation as a war scenario.

After Bundy gave the command to get his cattle, Engel posted: "Leaving now to shut down the freeway by force of arms." Engel arrived at the Impoundment Site armed with his assault rifle.



He walked along I-15 until he reached a location where he had a clear view of the law enforcement officers in the wash in a low and exposed position.



Having found a location from which to take up a tactically superior position on the federal law enforcement officers below, Engel crouched down for cover behind a jersey barrier, maintaining his firearm in a low-ready position, from which it could quickly be raised to fire.





As the level of violence escalated and gunmen move to the gate, the officers were forced to abandon their position and the cattle. Engel posted again to his Facebook account: "BLM lost and has backed down due to overwhelming force of the people and our arms. WE WIN! Cattle being released as we speak. If they don't trouble will start". Engel is unequivocally clear in the purpose of what he had done. He understood fully that the gunmen, in accordance with Bundy's command, had used the threat of gunfire to force federal agents to abandon their duties. Engel is also clear that the gunmen presented a continued threat to the officers and would again threaten force if they attempted to resume their duties.

**E.     Post-Assault Conduct by Engel**

Engel does not deny his role as a gunman in the assault and extortion of April 12. On April 14, 2014, he commented on a picture on Facebook depicting Followers in the skirmish line in the wash: "What you don't see is there was another 150 of us with guns behind those cowboys."

On April 20, 2014, Engel posted a description of the assault, including how he went for a "guerilla war" and was searching out "enemy positions." According to him, the assault was part of a war against the federal government, admitting to his role as a gunman.

But Engel's role in the conspiracy is not limited to the assault and extortion on April 12. He remained at Bundy Ranch thereafter to prevent any further law enforcement actions against him or his co-conspirators, engaging in armed patrols of the area. Engel was interviewed and photographed by a local media outlet while participating in an armed patrol.

## Future Uncertain in Bundy-BLM Dispute



STEVE MARCUS — Todd Engel, a volunteer from North Idaho who is supporting the Bundy family, returns to a campsite after a patrol near Bunkerville Sunday, April 13, 2014. The Bureau of Land Management halted their roundup of Bundy family cattle under an agreement reached Saturday.

Engel provided consensual interviews to media, blogs, and even law enforcement. In an April 14, 2014 blog radio interview, Engel stated that he was near Bunkerville with 20-30 other gunmen; that he had arrived the morning of April 12, 2014; and that he participated in the assault. Engel also stated that when he returned to Idaho, he would introduce himself to the head of the Forest Service there and let him (the head) know he (Engel) had been at Bundy Ranch and that "you're going to have that at your doorstep".

On April 22, 2014, Engel initiated a voluntary interview with the Bonner County, Idaho Sheriff's Office. The officers recorded the interview.

In the interview, Engel expressed pride in his role as a sniper/gunman at Bundy Ranch, stating he was "duty bound" to respond to Bunkerville, admitting he had been on the bridge and "armed to the teeth." Engel stated that he told a Metro officer near him that the "BLM" needed to stand down and repeatedly shouted to the "BLM to stand down."

Engel also stated that he was worried there would be consequences for his involvement in the assault and that he would fight if confronted by federal law enforcement officers. Engel

asked that the Sheriff's Office "stay out of it" so no harm would come to them. Engel said that he was ready to "wage war" with the federal government, which he perceived to be illegal and unconstitutional. Finally, Engel asked the Sheriff's Office to tell him when a warrant came for his arrest so he could flee before it was served and "not cause any chaos in this place."

Engel has been eager to find another opportunity to kill cops.  In April of 2015, a year after the assault and extortion, a dispute arose between the BLM and miners in Grants Pass, Oregon at the Sugar Pine Mine. The miners requested outside assistance, to which various Bundy Ranch veterans responded, hoping for another Standoff with the BLM. The BLM avoided the miners and armed occupants to prevent another Bundy Ranch.

On April 22, 2015, Engel commented regarding a posting about the Sugar Pine mine event on a Facebook page.  This Facebook page contains the below photograph of Engel and others posing in front of a bulldozer at the Sugar Pine mine near Grants Pass, Oregon. In response to the Facebook page's description of his trip to the mine, Engel responded by posting lengthy quotes from Patrick Henry, ending with "The war is inevitable and let it come! I repeat it, sir, let it come."



Engel also chose to get involved in the armed occupation of the Malheur National Wildlife Refuge (MNWR), which began on January 2, 2016 and ended 41 days later. On or about January 13, 2016, Engel posted a video to his Facebook account in which he states that the feds should "back down" from the MNWR and expressed displeasure that Ammon Bundy, a leader of the occupation, chose a tactically poor plan for a confrontation with the government. "So now what? We have to come to your aid with rifles because you can't handle it."

On February 8, 2016, a recording of a January 24, 2016 conversation including the voice of Todd Engel (listed as veteran of Bundy Ranch) was posted to the internet. In it Engel and others called Lavoy Finicum, a leader of the armed occupation of the MNWR, days before he was killed resisting arrest and reaching for a firearm during his arrest by federal agents. Engel and others warned Finicium that the FBI was going to raid them in the next few days. During the conversation, Finicium is urged to make a tactical, lateral move to a county with a strong constitutional sheriff (e.g., a sheriff who believes he has the legal authority to resist the implementation of federal laws), so that they could continue to spread the "brushfire" of liberty

in the minds of other ranchers. Engel advised Finicum that he would be able to deploy highly trained armed security to assist him if he left MNWR and set up in another county. These armed individuals were described by Engel as better than what they had currently at the MNWR. Engel specifically states:

> If we lose you guys to prison, it's a big hit for the farmers and really set them back in fear. But if you guys can live to fight another day, and move over to another friendly sheriff's county and continue to fight against the BLM and EPA at the same time, at that point...**I'm pretty sure I can round up some pretty seriously armed dudes to come and hang out with you guys. It wouldn't be like the kind of guys you have now, I was there yesterday.** But you would have the support, it would be a great tactical and yet strategic move to just pop smoke on that location. You are now constructing your Alamo and your own prison and it's almost done here. If you guys were able to move over to a friendly sheriff, move over into the county of a friendly sheriff, and continue to fight, it would do more good for those ranchers in Harney County from Utah then from prison.

Toll records during the MNWR occupation show phone contact between Engel and occupation leaders Ammon Bundy and Brian Cavalier, as well as co-conspirator Eric Parker.

## II.   ARGUMENT

The Bail Reform Act provides that a judicial officer shall detain a defendant pending trial where "no conditions or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is appropriate where a defendant poses either a danger to the community or a risk of non-appearance and it is not necessary to prove both. *See United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). The Government must establish by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant is a risk of non-appearance. *Id.*

In determining whether pretrial detention is appropriate, Section 3142 provides four factors for the Court to consider: (1) the nature and circumstances of the offense charged,

including whether the offense charged is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by the defendant's release. *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); 18 U.S.C. § 3142(g).

Where, as here, there is probable cause to believe that the defendant has committed an offense under Title 18, United States Code, Section 924(c), the court shall presume, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(B).

At the detention hearing, the Court may properly rely upon a proffer by counsel in determining a defendant's danger to the community or risk of flight. *See United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986) ("'[T]he government may proceed in a detention hearing by proffer or hearsay.'").

### A.     The Offenses Charged Are Based on the Engel's Crimes of Violence and His On-Going Defiance of Federal Authority

Crimes of violence for purposes of the Bail Reform Act include any offense that has as "an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," and is a felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." See 18 U.S.C. § 3156(a)(4)(A). Here, eight of the Counts contained in the Superseding Indictment against Engel are crimes of violence: assault on a federal officer with a firearm and deadly weapon; threatening federal law enforcement officers; extortion by force and violence; conspiracy to impede and injury a federal officer; and Section 924(c) counts as to each.

Engel's charges are grounded not only in violence and his lawless acts, but also in his complete disregard for the rule of law. Engel came to Bunkerville in response to Bundy's call for

violence against federal law enforcement officer.  Engel's actions and his words show that he was willing to kill law enforcement officers.  He has said and shown that he would do it again.

Engel is violent and lawless.  As such, he presents a danger to the law enforcement community and, for that matter, anyone who seeks to enforce laws against Engel that Engel believes are from a "tyrannical" government.  In Engel's mind, only Engel is the judge of what laws apply to him and should the court release him, only Engel will decide when and where those laws will be enforced.

Thus, there are no conditions or combination of conditions that any federal court could impose to protect the community from his lawlessness, whether that community is comprised of the citizens using the public lands or federal law enforcement officers and civilian employees attempting to manage the resources and enforce the laws.  All are subject to Engel's whim and his proclivity to use force and violence to make his point.

B.      **Substantial Evidence Exists Establishing the Defendant's Guilt**

In the immediate aftermath of the April 12 assault, federal law enforcement officers were forced to abandon the impoundment site, precluding them from conducting an immediate investigation.  Out of safety concerns and the need to deescalate the violence and restore order, the remaining local law enforcement officers – who themselves were outnumbered by Bundy's Followers – allowed the gunmen and the conspirators simply to leave the site without making any arrests, conducting any interviews, taking any statements, or obtaining any identification of the gunmen and other assaulters.

Absent contemporaneous arrests and identifications, the investigation became purely historical in nature.  The presence of many gunmen in and near the area of Bundy Ranch, the armed checkpoints and patrols, the presence of assault weapons in the militia camps, including a

.50 caliber machinegun, further increased the difficulty of conducting a physical investigation of Bundy Ranch or the impoundment site.

All of that said and despite those obstacles, the investigation began the day after the assault and continues to this day, identifying the assaulters, where they came from, how they got to Nevada, their connections to Bundy and others and their role in the assault and the aftermath.

To date, the government has conducted hundreds of witness interviews; executed dozens of search warrants; reviewed, organized and analyzed hundreds of thousands of pages of documents (mostly from social media); reviewed, organized and analyzed thousands of pages of telephone records; and organized, reviewed and analyzed hundreds of hours of audio and video recordings.

Engel freely admitted that he brought his assault rifle to Bundy Ranch for the purpose of forcing the law enforcement officers to return the cattle at gun point. He remained at Bundy Ranch in the aftermath of the assault and extortion to use force and violence against law enforcement officers who might arrest Bundy and his co-conspirators.

Since Bundy Ranch, he has eagerly sought out additional opportunities to get into a violent confrontation with the government, most recently at the MNWR. There is no evidence that he has changed his mind about any of this. Accordingly, he should be detained because no conditions can ensure that he will not use force and violence again.

### C.    The Defendant's History and Characteristics Demonstrate the Danger and Risk of Non-Appearance He Poses

As discussed above, Engel believes in using guns against law enforcement officers because, according to him they have no authority, further making him an unlikely candidate for court-ordered supervision. At a minimum, any release order would require Engel to abide by all laws. But he has already stated that he does not believe that federal laws apply to him. There is

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 21

no evidence to suggest that he has changed his mind about that or about his twisted view of the violence at Bundy Ranch, his role in it, or about federal law enforcement officers in general. Simply put, Engel believes his has a right to use a gun when he disagrees with the law.

Engel also faces a potentially lengthy prison sentence if convicted of the current charges, including a consecutive seven year mandatory minimum sentence under 18 U.S.C. 924(c). He has a strong incentive to flee because of the likelihood of a significant prison sentence if he is convicted. *United States v. Townsend*, 897 F.2d at 995 ([F]acing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight.")  He has further told local law enforcement that he intends to flee, trying to enlist their aid to inform him of any warrants, threatening violence if he is not allowed to flee.

**D.      The Defendant Poses A Significant Danger to the Community**

The Defendant's conduct in April of 2014 risked many people's lives – he introduced an incredibly dangerous weapon and brought gunmen to a volatile situation to illegally obtain property. This callousness toward human life and willingness to engage in calculated violence with a complete disregard for the safety of civilians and the rule of law shows that the defendant is a grave danger to his community. Moreover, his continual search for a new violent confrontation with the government shows that Engel is willing to put others at great risk of injury.

**E.      Only Pretrial Detention Will Reasonably Assure the Safety of Others and the Community and the Defendant's Future Appearance**

There is no evidence to rebut the presumption of detention in this case.  The charges, the evidence, the defendant's history and the danger posed by his continued release all show that detention is warranted here.  As already discussed, any terms of release would have to include

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 22

that Engel obey all laws.  He cannot follow that – he has stated and demonstrated that will not adhere to laws he does not believe in.

Even the most stringent of conditions are insufficient to assure the safety of the community or the appearance of the Defendant given that ultimately, they must rely on the Defendant's good faith compliance.  *See United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (Noting that although the defendant and pretrial services proposed "strict' conditions, "they contain[ed] one critical flaw. In order to be effective, they depend on [the defendant's] good faith compliance."); *see also Tortora*, 922 F.2d 880, 886 (1st Cir. 1990)  (concluding that an extensive set of release conditions contained "an Achilles' heel ... virtually all of them hinge[d] on the defendant's good faith compliance").   In *Tortora*, an alleged member of a prominent mafia family stood trial for crimes under the racketing and organized crime statute.  The First Circuit considered the elaborate conditions proposed that would restrict any communications with the defendant's cohorts.  Ultimately, the court rejected those conditions, recognizing that "the conditions as a whole are flawed in that their success depends largely on the defendant's good faith-or lack of it. They can be too easily circumvented or manipulated." *Tortora*, 922 F.2d at 886.

Such considerations are doubly present here, given that the Defendant's crimes in this case are rooted in his defiance of federal court orders, and that his commitment to flouting federal authority was dramatically and violently demonstrated, with no disavowal or remorse— and every effort to repeat them—up until the present time.

III.    **CONCLUSION**

For the reasons stated herein, the Defendant is a danger to the community and a poses a risk of non-appearance such that no conditions or combination of conditions will reasonably

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 23

assure the safety of others or his appearance at future proceedings. Accordingly, the United

States respectfully requests that the Court order the Defendant detained pending trial.

Dated this 3rd day of March, 2016.


WENDY J. OLSON
UNITED STATES ATTORNEY
By:


JUSTIN D. WHATCOTT
Assistant United States Attorney


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March ____, 2016, the foregoing **GOVERNMENT'S
MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION** was electronically filed
with the Clerk of the Court using the CM/ECF system, and that a copy was served on the
following parties or counsel by:

|  | ☐ United States Mail, postage prepaid |
|  | ☐ fax |
|  | ☒ ECF filing |
|  | ☐ email |


_____
Legal Assistant


GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 24