DANIEL G. BOGDEN
United States Attorney
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
Assistant United States Attorneys
NADIA J. AHMED
ERIN M. CREEGAN
Special Assistant United States Attorneys
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada 89101
PHONE: (702) 388-6336
FAX: (702) 388-6698

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
### -oOo-

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 2:16-cr-00046-GMN-PAL |
| vs. | GOVERNMENT'S MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S ORDER OF RELEASE PENDING TRIAL |
| STEVEN A. STEWART | |
| Defendant. | |

The United States of America, moves for revocation of the order of the Magistrate Judge in the District of Idaho, releasing defendant Steven A. Stewart pending trial. The Government submits that the evidence demonstrates that the defendant presents both a risk of non-appearance and a danger to the safety of others and the community.

## I.    RELEVANT PROCEDURAL HISTORY

On March 2, 2016, a federal grand jury seated in the District of Nevada returned a Superseding Criminal Indictment, charging defendant Steven A. Stewart ("Stewart") and 18 other defendants with, among other things, conspiring to assault federal officers, obstruct justice, extort federal officers, and use and brandish a firearm in

1

relation to a crime of violence, and the substantive offenses that comprise the objects of the conspiracy, all in violation of Title 18, United States Code, Sections 371; 372 111(a)(1) and (b); 1503; 1951; and 924(c).

On March 3, 2016, Stewart was arrested in the District of Idaho pursuant to an arrest warrant issued from the Superseding Indictment. On March 4, 2016, Stewart appeared in court, was appointed CJA counsel, and waived an identity hearing. District of Idaho Case 1:16-mj-08428-CWD-3. The Government moved for detention both as a risk of flight and a danger to the community and filed a written detention memorandum. Idaho Docket ## 10-11. *See* Attachment A.

On March 10, 2016, United States Magistrate Judge ("Magistrate Judge") Candy W. Dale held a detention hearing. *See* Attachment B (Audio recording of Stewart's March 9, 2016 Detention Hearing). The Government's argument and proffer was based on the facts and circumstances of the instant case as set forth in the Superseding Indictment and the facts and arguments set forth in its detention memorandum. Stewart called one witness, his girlfriend, and submitted two letters to the court. *See* Attachment C.

At the conclusion of the detention hearing, the Court ordered Stewart released with conditions. *See* Attachment D. The Government requested a stay in the detention proceedings to file the instant motion. The Magistrate Judge granted the Government's request and ordered the Government to file its motion in this Court by March 11, 2016.

2

## II.   ARGUMENT

The Government respectfully requests that this Court reverse the Magistrate Judge's order releasing the defendant pending trial, and enter an order detaining the defendant both as a danger to the community and a risk of flight.  Under 18 U.S.C. § 3145, if a magistrate judge orders a defendant released, the Government "may file, with the court having original jurisdiction over the offense, a motion for revocation of the order," and "[t]he motion shall be determined promptly."  In out-of-district cases, a magistrate judge's release decision must be reviewed in the charging district by the District Court, not the district of arrest.  *See United States v. Evans*, 62 F.3d 1233, 1237 (9th Cir. 1995).

This Court reviews the order of release de novo, with no deference to the Magistrate Judge's decision.  *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990); *see also United States v. King*, 849 F.2d 485, 491 (11th Cir. 1988); *United States v. Maull*, 773 F.2d 1479, 1481 (8th Cir. 1985) (en banc); *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985).  This Court can review the evidence presented to the magistrate judge and makes its own independent determination.  *Koenig*, 912 F.2d at 1193.  However, this Court can also hear additional evidence and argument.  *Id.*  The Government has attached the audio recording of the detention hearing, its detention memorandum, and the two letters that Stewart submitted to the court.   It is the Government's understanding that Pretrial Services will provide the Court with Stewart's pretrial report prepared in the District of Idaho.

The Government adopts and incorporates by reference all the evidence it proffered in the District of Idaho and all the arguments advanced in support of

detention.  The Government further submits as follows.

The Superseding Indictment charging four violations of 18 U.S.C. § 924(c) provides a presumption, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the defendant as required, and the safety of the community.  *See* 18 U.S.C. § 3142(e)(3)(B).  Because of the nature and circumstances of the offenses charged against Stewart which give rise to the presumption of detention, the Government submits that no evidence will be sufficient to rebut the presumption of detention.  However, even if rebutted, the presumption "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."  *See United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) *quoting United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986).

The Magistrate Judge stated that there was "some hesitation on [her] part" in releasing Stewart.  The Government shares that hesitation and respectfully submits that Stewart proffered nothing to rebut the presumption in this case – a presumption that remains in the case as an evidentiary finding – that he is a danger to the community.  In essence, Stewart advanced three reasons to rebut the presumption: his assault rifle was not loaded, there are no pictures of him aiming his weapon at law enforcement officers, and he left after the assault was over.  The first is irrelevant and belied by the evidence – the other two are simply irrelevant.  Furthermore, all three reasons are premised on the argument that Stewart acted less violent than his co-

defendants Eric Parker and Scott Drexler.[1] The fact that Parker and Drexler's conduct both during and after the events of April 12, 2014, might be more egregious does not mitigate Stewart's own conduct.

As to the "unloaded" weapon, the uncontested photograph at page two of the Government's memorandum depicts Stewart with his assault rifle at the ready with a magazine inserted into the rifle. In everyday parlance, inserting a magazine into a rifle is typically referred to as "locked and loaded." There simply is no common-sense reason for Stewart to undertake the effort of inserting an empty magazine into his rifle. Further on this point, the photograph also depicts him carrying a holstered sidearm. There is no reason – and Stewart advances none other than his self-serving representation – that he would undertake the effort to carry two unloaded firearms when he decided to move to and stand on a bridge overlooking law enforcement officers who were fully armed and guarding the Impoundment Site while a force of about 270 people were moving on it. Stewart was standing mere feet from both Parker and Drexler when they assumed proned positions on Interstate 15 pointing their assault rifles at law enforcement. Finally the evidence is strong that Stewart acted as a spotter for Parker.

More to the point, whether the weapon was loaded or unloaded, or whether Stewart is aiming his rifle, is completely irrelevant. Stewart is shown in the

---

[1] The Magistrate Judge in the district of Idaho ordered both Parker and Drexler detained pending trial in this case. Both hearings occurred just before Stewart's detention hearing. The next day, the Magistrate Judge ordered defendant Todd Engel detained. In this case, nine defendants have been detained pending trial, three have been detained pending their appearance in this District, five are detained in the District of Oregon on separate charges, and one defendant's detention hearing is scheduled for March 11, 2016. Only Stewart has been released on conditions.

photograph clearly brandishing his weapon in full view of the officers below and across from him at the precise moment that two of his co-conspirators – Parker and Drexler – are in the prone position and aiming their weapons at the officers at the gate. The fact that Stewart is not concealed or aiming his rifle at the precise time that the photograph was taken does not mitigate the threat he posed to the officers. The Superseding Indictment charges that the officers were threatened by rifles they could observe on the bridges. By brandishing his rifle in full view of the officers, Stewart is threatening to assault and is in fact assaulting the officers with a deadly weapon and, further, is working with his co-conspirators to interfere with the law enforcement officers in executing the enforcement of court orders by force and violence and to extort the cattle by force and violence.

Also irrelevant is the notion that Stewart is no longer a danger to the community because he left after the assault and extortion. The Indictment charges that Stewart was a co-conspirator in the assault and extortion of April 12 and that conspiracy continued well after April 12 and at least to the date of the Superseding Indictment, the conspirators pledging to use force and violence in the future to keep law enforcement officers from recovering the ill-gotten gains from the extortion or enforcing the laws against Bundy and the co-conspirators. Whether Stewart left after the assault does not, as a matter of law, constitute a withdrawal from the conspiracy. Once he's in; he's in. And he only gets out if he affirmatively withdraws. Inaction on his part is not withdrawal.

That Stewart remained a part of the conspiracy is reinforced by the fact that, as adduced during Stewart's detention hearing, he traveled to Burns, Oregon, to join with

his co-conspirators from Bundy Ranch to advocate that two individuals not turn themselves in to serve a federal prison sentence. But even without this material fact, the evidence proffered and the allegations of the Superseding Indictment make clear that Stewart joined a continuing conspiracy and absent any evidence or proffer that undertook efforts to withdraw, he remained in it and he remains a danger.

Simply put, the proceeds from the extortion still roam the public lands under the forceful protection of Bundy and his co-conspirators, including Stewart. As long as the cattle are there, the promise that Bundy and his co-conspirators will "do it again" if the federal government takes law enforcement action remains in place. Stewart has done nothing to renounce that promise, renounce or disavow the actions of his co-conspirators, or renounce or disavow his own actions. All he has done is attempt to minimize his involvement which neither rebuts the presumption nor mitigates his continuing danger to the community.

## III.    CONCLUSION

The evidence demonstrates by conclusion clear and convincing evidence that no condition or combination of conditions can be fashioned to combat the nature and seriousness of the danger that defendant's release would posed to any person or the community. Stewart is clearly a danger to the community. Furthermore, Stewart has completely failed to rebut the evidence that he is a danger to the community. At his detention hearing, Stewart proffered that he did not point his "unloaded" assault rifle at law enforcement on April 12, 2104. That is insufficient to overcome the presumption in this case.

The United States respectfully asks this Court to vacate the Magistrate Judge's order releasing Stewart pending trial and order Stewart detained pending trial as a danger to the community and a risk of non-appearance.

DATED this 11th day of March, 2016.

Respectfully submitted,

DANIEL G. BOGDEN
United States Attorney

_____//s//_____
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
Assistant United States Attorneys
NADIA J. AHMED
ERIN M. CREEGAN
Special Assistant United States Attorneys

# Attachment A

WENDY J. OLSON, IDAHO STATE BAR NO. 7634
UNITED STATES ATTORNEY
JUSTIN D. WHATCOTT, IDAHO STATE BAR NO. 6444
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA IV
800 EAST PARK BOULEVARD, SUITE 600
BOISE, ID 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-1413

DANIEL G. BOGDEN
UNITED STATES ATTORNEY
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
ASSISTANT UNITED STATES ATTORNEYS
NADIA J. AHMED
ERIN M. CREEGAN
SPECIAL ASSISTANT UNITED STATES ATTORNEYS
333 LAS VEGAS BLVD. SOUTH, SUITE 5000
LAS VEGAS, NEVADA  89101
PHONE: (702) 388-6336
FAX: (702) 388-6698

## UNITED STATES DISTRICT COURT
### DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Case No. |
| Plaintiff, | ) |
| | ) |
| v. | ) **GOVERNMENT'S MEMORANDUM IN** |
| | ) **SUPPORT OF PRETRIAL DETENTION** |
| | ) |
| STEVEN A. STEWART, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| ———————————————————— | ) |

The United States, by and through undersigned counsel, respectfully submits this

Memorandum in Support of its Motion for Pretrial Detention pursuant to The Bail Reform Act,

Title 18, United States Code, Section 3142.  As explained herein, the government seeks the

continued pretrial detention of defendant Steven A. Stewart ("Stewart") both as a risk of non-

appearance and as a danger to the safety of others and the community.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 1

Stewart was a gunman/sniper in an unprecedented and extremely violent and massive armed assault on federal officers that occurred on April 12, 2014, while those officers were performing their duties as part of a court-ordered cattle impoundment operation. But for the courage of the victim officers to back away from their assaulters and abandon the cattle, the actions of Parker and his co-conspirators would have resulted in catastrophic death or injury to the officers and others. The fact that no one was shot, however, does not mitigate either the level of violence used that day or the intent behind it.



Stewart

Stewart was there because he answered a "call-to-arms" from his co-defendant, Cliven Bundy, to come to Nevada to forcibly stop federal law enforcement officers from the executing court orders to impound his cattle. In response to the call, Stewart knowingly traveled from Idaho to Nevada with firearms and ammunition and the intent to use them against those law enforcement officers.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 2

Knowingly joining Bundy's conspiracy, Stewart's actions on April 12 betrayed his desire and willingness to kill cops. This alone compels the conclusion that Stewart is a grave danger to the community and a flight risk.

Stewart is currently charged with crimes of violence including assault on a federal law enforcement officer, extortion by force and violence and using and brandishing firearms in connection with crimes of violence under Title 18, United States Code, Section 924(c).  As such, the Bail Reform Act presumes that there are no conditions or combination of conditions that will ensure the safety of the community.  Here, no evidence has been adduced during the investigation of the instant charges that rebuts that presumption.  In fact, all the evidence suggests that Stewart will continue to be a threat to law enforcement officers, will not abide by court orders, and will use threats of violence and violence to ensure that federal laws are not enforced as to him and others.

I.  **FACTS**

On March 2, 2016, a federal grand jury seated in the District of Nevada returned a Superseding Criminal Indictment, charging Stewart and 18 other defendants with, among other things, conspiring to assault federal officers, obstruct justice, extort federal officers and use and brandish a firearm in relation to a crime of violence, and the substantive offenses that comprise the objects of the conspiracy, all in violation of Title 18, United States Code, Sections 371; 372; 111(a)(1) and (b); 1503; 1951; and 924(c).

Stewart was arrested on the instant charges on March 3, 2016, pursuant to an arrest warrant issued from the Superseding Indictment.  Based on the evidence adduced from its investigation to date, the government proffers the following in support of its motion for pretrial detention:

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 3

A.      Background

Stewart, 32, resides in Hailey, Idaho and it appears he is currently employed.  His criminal history is unremarkable.  Evidence indicates that Stewart has carried firearms on his person.

Co-defendant, Cliven Bundy ("Bundy"), 69, is a long-time resident of Bunkerville, Nevada, living on 160 acres of land in a very rural and sparsely-populated area of the state. Bundy Ranch, as he refers to the property, is located near the Virgin River a few miles from where Interstate 15 crosses from Nevada into Arizona, approximately 90 miles northeast of Las Vegas, Nevada.  Bundy Ranch is surrounded by hundreds of thousands of acres of federal public lands commonly referred to as the Gold Butte area or the Bunkerville Allotment.  Bundy uses that entire range of land to graze his cattle unlawfully.

While Bundy claims he is a cattle rancher, his ranching operation – to the extent it can be called that – is unconventional if not bizarre. Rather than manage and control his cattle, he lets them run wild on the public lands with little, if any, human interaction until such time when he traps them and hauls them off to be sold or slaughtered for his own consumption.  He does not vaccinate or treat his cattle for disease; does not employ cowboys to control and herd them; does not manage or control breeding; has no knowledge of where all the cattle are located at any given time; rarely brands them before he captures them; and has to bait them into traps in order to gather them.

Nor does he bring his cattle off the public lands in the off-season to feed them   when the already sparse food supply in the desert is even scarcer.  Raised in the wild, Bundy's cattle are left to fend for themselves year-round, fighting off predators and scrounging for the meager amounts of food and water available in the difficult and arid terrain that comprises the public

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 4

lands in that area of the country.  Bereft of human interaction, his cattle that manage to survive are wild, mean and ornery. At the time of the events giving rise to the charges, Bundy's cattle numbered over 1,000 head, straying as far as 50 miles from his ranch and into the Lake Mead National Recreation Area ("LMNRA"), getting stuck in mud, wandering onto golf courses, straying onto the freeway – foraging aimlessly and wildly, roaming in small groups over hundreds of thousands of acres of federal lands that exist for the use of the general public for many other types of commercial and recreational uses such as camping, hunting, and hiking.

Bundy claims he has strong anti-federal government views, proclaiming that the federal government cannot own land under the U.S. Constitution.  These are not principled views – and certainly they have no merit legally – but nonetheless serve conveniently as a way for Bundy to somehow try to convince others that he has some reason for acting lawlessly, other than the obvious one: it serves his own ends and benefits him financially.  Untethering himself from the law, Bundy claims he can do with his cattle as he pleases, including not incurring the expenses to manage or control them and not paying for the forage they consume at the expense of federal taxpayers.

Federal law requires any rancher to pay fees and obtain grazing permits to run cattle on public lands.  The evidence suggests that before 1993, Bundy paid fees and kept current the permit his father before him had acquired for grazing cattle on the Bunkerville Allotment. In 1993, however, when BLM restricted both the number of head he could graze and the seasons during which he could graze them, Bundy was faced with the prospect of having to control his herd and bring them off the land during the off-season.  It was then that Bundy claimed that he supposedly "fired the BLM" and refused, from then until to the present, to pay any grazing fees or submit to permits.

It appears that Bundy made some attempt to fight the 1993 restrictions administratively but to no avail.  But despite losing, he continued in his scofflaw ways, ignoring BLM regulations and restrictions pertaining to his use of the public lands, allowing his cattle to run wild and refusing to pay for the forage he leached off the taxpayers.

Ultimately, the BLM sued him in 1998 for trespass, the case being filed in the United States District Court for the District of Nevada before then-United States District Judge Johnny Rawlinson. Bundy lost the case and Judge Rawlinson issued an order requiring Bundy to remove his cattle permanently from the Bunkerville Allotment (hereinafter "the 1998 Order").  Making the same failed claims he continues to make to this day – the federal government cannot own the land – Bundy appealed the 1998 Order to the Ninth Circuit but lost there also.

Undeterred, Bundy simply ignored the 1998 Order, running his cattle as he always had, violating the 1998 Order just as he had all the other rules and regulations governing public lands. In 1999, Judge Rawlinson issued another order, re-affirming the 1998 Order and fining Bundy for each day he refused to remove his cattle.  He ignored that Order just as he had the previous one.

Thereafter, other attempts were made to remove or have Bundy remove his cattle, all to no avail.  The BLM went back to Court in 2012, filing a new lawsuit against Bundy to remove his cattle from the LMNRA and also filing a motion to renew the 1998 Order pertaining to the Bunkerville Allotment.

United States District Judge Lloyd George presided over the 2012 action. As he had before, Bundy claimed that the federal government could not own the land. However, in keeping with well-established legal precedent, Judge George – like every other previous court – rejected Bundy's claims in a July 2013 Order and required Bundy to permanently remove his cattle from the LMNRA within 45 days.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 6

The motion in the 1998 action went before United States District Judge Larry Hicks. Like Judge George, Judge Hicks rejected Bundy's claims in an October 2013 Order, re-affirming the 1998 Order and requiring Bundy to remove his cattle from the Bunkerville Allotment within 45 days.  The Orders from Judge George and Judge Hicks each authorized the BLM to remove and impound the cattle if Bundy refused to do so, Judge Hicks expressly ordering Bundy not to physically interfere with any seizure or impoundment operation conducted by the BLM.

As before, Bundy refused to remove his cattle.  Thus, the 2013 Orders in hand, the BLM commenced impoundment operations beginning around April 5, 2014. From the outset, Bundy interfered.  The Superseding Indictment details Bundy's numerous threats to "do whatever it takes" to prevent the BLM from impounding his cattle and the escalating violence and threats of violence he used to impede and disrupt the impoundment, including blocking convoys, assaulting law enforcement officers and terrorizing civilian employees.

Most nefariously – and perhaps most relevant to the detention decision here – Bundy recruited gunmen to come to Nevada to confront the federal officers, issuing calls-to-arms over the internet to anyone who would listen to come to Bundy Ranch to confront the officers who were executing the federal court orders to impound the cattle.

Stewart answered that call.  He traveled to Nevada with firearms and with the intent to use them against federal law enforcement officers.  There is no evidence that he won't answer the call again.

**B.      The April 12, 2014, Armed Assault**

By April 12 hundreds of people, including gunmen, had answered Bundy's calls-to-arms against the BLM.  As the gunmen arrived, Bundy and his co-conspirators organized them into so-called "militia camps," deploying them from there into armed security checkpoints and patrols.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 7

On April 12, Bundy rallied his Followers and commanded them to take his cattle back, unleashing over 400 Followers, including at least 60 of them armed, to converge on and assault the BLM's impoundment site, demanding the release of the impounded cattle corralled there. The Superseding Indictment sets out the nature of the assault that day. While the government does not intend to repeat those allegations here, it incorporates them by reference and further proffers as follows.

- **The April 12 assault was an extremely violent act.**

As the Court knows, it is a violation of federal law to use a firearm to assault, interfere with or intimidate a federal law enforcement officer. And contrary to the fiction incanted by Bundy and his Followers to stir up support and pollute the minds of children, there is no First or Second Amendment right, or other right recognized in the law anywhere, that gives anyone the right to use or carry, let alone brandish, raise or point, a firearm in order to assault, intimidate, interfere with or prevent a federal law enforcement officer from performing his or her duties – whether one thinks the officer is acting constitutionally or not. While that should be obvious to any law abiding citizen, Bundy and his Followers, including Stewart, espouse to the contrary.

On April 12, Bundy had mustered more than 60 firearms to assault and intimidate federal law enforcement officers while they were performing their duties. The evidence shows that officers confronted an angry array of more than 270 Followers directly in front of them, their formation being backed up by gunmen brandishing or carrying rifles and firearms among the unarmed Followers, or perched on high ground in over-watch positions, or in concealed sniper positions aiming their assault rifles from bridges. The officers guarding the gate that day, almost to a person, thought either they, or unarmed civilians in front of them, or both, were going to be killed or wounded. Many of these officers, some of them combat veterans, remain profoundly affected emotionally by this event to this day. Witnesses have described the level of violence as

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 8

so intense that something as innocent as the backfire of vehicle, or someone lighting a firecracker, would have set off a firefight between the gunmen and the law enforcement officers.

The Superseding Indictment charges, and the investigation shows, that Bundy was responsible for recruiting gunmen, including Stewart. Bundy and his co-conspirators did so by issuing numerous calls to arms, inciting and soliciting others to bring weapons to Bundy Ranch, to show force, to make the BLM back down, to surrender, and other similar exhortations. The justification, according to Bundy and his followers: BLM was acting unconstitutionally in impounding his cattle. In other words, BLM was enforcing the law and Bundy didn't like it – so he organized an armed assault.

- **Bundy, his co-conspirators and Followers have pledged to do it again.**

The evidence shows that this was an unprecedented act. The gunmen traveled great distances in a short period of time, Stewart being only one example among many, answering the call to arms, coming from more than ten states to get to Bundy Ranch to confront the BLM, flooding into the Ranch between April 10 and the morning of April 12. The evidence shows that when the gunmen arrived, the conspirators organized them into camps, armed patrols, and security check points.

The evidence shows that Bundy rallied and directed his Followers to get his cattle out of the impoundment site on the morning of April 12. Bundy's son, Ammon, led the assault on one of the entrances to the site. Indicative of his intent that day was his statement to another person as he was drove his truck to the impoundment site: "These federal agencies have a lot of power and they are not just going to give that power up. The people just have to take it, I guess."

In the immediate aftermath of the assault and extortion, after having delivered the extortionate demands to the SAC and coercing the officers into leaving by threatening violence,

Ammon Bundy was asked whether BLM was gone for good. Ammon responded: "They better be or the people will do it again."

In an interview later in the evening on April 12, Ammon Bundy stated:

We the people expressed our power and as a result the Sheriff took control of his county. The Sheriff must protect the agency of man. The people have the power -- it's designed that way -- you have the people and then you have the Sheriff. Sovereign citizens on our own land.

Many of these same gunmen who conspired with Bundy and his son to assault the impoundment remain at large and, through Facebook posting and other social media outlets, have pledged to support Bundy again if BLM takes any action against him.

### C.      Post-Assault:  April 13 and thereafter

Immediately after the assault, Bundy and his co-conspirators openly celebrated their use of force, showing the world that not only did they lack remorse for their violent criminal acts – they were proud of them.  In an interview posted to the Pete Santilli Show's YouTube channel on or about April 16, 2014, Cliven Bundy was interviewed by an individual named Peter Rense. When asked whether the BLM still had officers in the area, Bundy stated, "We the people and the militia definitely rid this place of any of that kind of influence."  *See* https://www.youtube.com/watch?v=dI-3qYTMGgU (last visited February 11, 2016).  In the same interview, Bundy expressed dismay that the BLM was allowed to leave with their weapons on April 12:  "we haven't won the war, we've just won one chapter of it."  *Id.*  Bundy's characterization of the assault as part of a larger "war" makes clear that his efforts to thwart and interfere with BLM law enforcement officers would carry on.

To that end, Bundy relied on armed individuals who continued to travel to Bundy Ranch in the months after the assault.  Camping in and around what the Bundys designated as "militia camps," these gunmen engaged in reconnaissance missions, manned check points on public

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 10

roads, and conducted armed patrols of the area around Bundy Ranch to ensure BLM officers were not present and would not return. Bundy and his conspirators established a firing range on public land which his lead bodyguard used to train other gunmen to protect Bundy and his ill-gotten gains.

On April 17, 2014, a local Channel 8 news reported on the continued armed presence in the area and stated that "Armed protesters continue to surround the Bundy ranch and are even blocking a county road. Some of the supporters attempted Thursday to keep a Channel 8 news crew from entering the area, despite it being a public road. . . . The armed men say they'll be at the site for weeks to come to defend the Bundy family." The news segment included footage of a Bundy guard blocking access to a public road.

Organized patrols of the public lands continued all through the summer into the fall of 2014. Additionally, evidence shows that telephone lines with roster information were set up, donation pages on the internet continued to be utilized to solicit funds, and gunmen traveled back and forth from other states to do duty at the Ranch. The purpose of these missions was to ensure Cliven Bundy was not arrested and that BLM did not return to the public lands either to impound the cattle or for any other purpose.

### D. Stewart's Role in the Conspiracy

Stewart was a gunman/sniper in the conspiracy. Starting on April 10, 2014, Stewart began to post messages regarding the BLM's impoundment operation in Nevada. For example, Stewart posted the link onto Facebook: "Last Man Standing. Rancher: armed feds are surrounding my farm" and commented "Seriously." On April 11, Stewart posted the following link on Facebook: "What does tyranny look like? This is it. CALL TO ARMS!!! All Minute Men and Militiamen in Nevada should go support Mr. Bundy and when they ask where the

Second American Revolution started 'we will say on a cattle ranch in the Nevada desert.'"
Stewart commented, "I feel like crap that I'm not already there."

Stewart and co-defendants Eric Parker and Scott Drexler left Idaho on April 11 and drove
10 hours straight through to Bundy Ranch, bringing with them assault rifles, handguns, and
ammunition.  On April 11 at 12:25 p.m., Stewart updated his Facebook status with the message:
"Headed to Nevada. Going to stand up with my fellow countrymen against a corrupt
government!!"

Stewart and his group arrived at Bundy Ranch at approximately 2:00 a.m. on April 12.
One of the Bundys eventually greeted them and asked if they wanted to camp in the "militia"
camp or with the protestors.  The "militia" camp was the designated area for gunmen.  Stewart
chose to be a gunman and picked the "militia" camp.  Stewart, Parker and Drexler then went on
patrol for two hours.

Later on the morning of April 12, and for the purpose of thwarting the impoundment,
Bundy organized and led over 400 Followers to assault the law enforcement officers as they
guarded the Impoundment Site, all for the purpose of getting his cattle back.   Stewart provided
security at the rally before heading to the Impoundment Site to get Bundy's cattle.



After the rally, Stewart followed Bundy's order to get his cattle from the officers. On April 12 at 11:24 a.m., Parker updated his Facebook status with the following: "Bundy gave the sheriff 1 hour to disarm the BLM…he did not reply. We are now going to free the cattle by any means. The sheriff claimed that the blm is standing down but offered no proof this is when Mr. Bundy gave him the 'do it or else.' We will not be lied to."

The evidence shows that as Bundy's Followers in the wash lined up to assault the gate, Stewart, and co-defendants Parker, Drexler, Todd Engel, Richard Lovelein and other gunman took positions on the Interstate 15 bridge overlooking the officers at the gate, brandishing their assault rifles at federal officers. As Bundy's Followers assaulted the gate in the wash below, Parker and Drexler prone sniper positions behind a jersey barrier aiming their assault rifles at federal law enfacement officers, ready to fire on the agents. Stewart continued to brandish his firearm and acted as a spotter for Parker.

Many of these same gunmen who conspired with Bundy and his son to assault the impoundment remain at large and, through Facebook posting and other social media outlets, they have pledged to support Bundy again if law enforcement takes any action against him.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 13

### E.     Post-Assault Conduct by Stewart

Immediately after the assault, Stewart openly celebrated his role in assaulting and

extorting the officers.  Here Stewart can be seen standing on the bridge, along with Parker,

Drexler, and Lovelein, next to a sign stating "The West Has Now Been Won."



Parker, who was standing next Stewart on the bridge, stated the following to a local

reporter:

**Reporter**:  Can you tell me who you are and why are you down here real quick?

**Parker**:  My name is Eric and we came down here from Idaho

**Reporter**:  Are you part of one of the militia groups?

**Parker**:  Nah, just independent, a county civil defense unit.

**Reporter**:  What does this victory for the Bundys mean you think?

**Parker**:   I think it means a lot but it needs to keep happening.   We need to keep
matching a show of force.  There is a rancher in Texas right now under threat from the
BLM 90,000 acres on the Red River their trying to take from him right now.   If you're in
Texas right now, go there, get on a bridge, show um force.

**Reporter**:  We saw some younger people down there, looked like they might have been
children.  Do you think that was wise to have those kids down there, do you think could
have turned dangerous?

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 14

**Parker**:  That might have been the only thing that kept them from getting gassed.  They threatened to shoot chemicals into that crowd.

**Reporter**:  Do you think it was good to have the kids down there?

**Parker**:  Absolutely!

**Reporte**r: Do you think this could have potentially turned violent?

**Parker**:  Absolutely!



STEWART posted a photo of men on horseback riding under the Interstate underpass and commented "Going to get the cattle back."



On April 12 Stewart shared a link on Facebook via Parker titled "SHOCK: Clark County Official: Bundy Ranch Supporters 'Better Have Funeral Plans'" to which STEWART commented, "We are completely ready."

On April 12, 2104, Stewart uploaded a two minute video onto his Facebook page. The video appears to be taken with phone and shows BLM vehicles retreating from the Impound Site on April 12, 2014 after the assault. A male, presumably Stewart provides the following commentary.

> "See you later, by guys by guys…. Shut it down shut it down. Give us the cows back…. These are the people that decided to fight against us instead of defending us. They work on the other side like that guy (the camera captures a local police officer)…. We were going to be martyrs if they wanted to continue this. You had so many more people than we did too… It's got to be so uncomfortable. Send the losers packing."

Soon after the April 12 assault, pictures and videos of people, including Stewart, Parker, and Drexler, brandishing and aiming their assault rifles at law enforcement went viral both in mainstream media and within the so-called "patriot" community. Later in the day on April 12, Stewart updated his Facebook status: "Everyone look at fox news online. I'm here eric is on the

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 16

front page." Later, he posted a link to FoxNews.com and commented, "Made it on the top page today. Look."

On April 19, 2104, Stewart updated his Facebook status: "I am a sovereign citizen."

On April 26, 2014, Stewart updated his Facebook status: "People don't know how personal this is to me. I work in a meat department and was just asked if the price of beef went up because of Bundy. I know they don't know so I did not yell at them but man am I pissed off."

On July 18, 2014, Stewart updated his Facebook status: "Defend the Constitution! Overthrow those who seek to pervert and interpret it. It's a straightforward document, not up for debate."

On September 16, 2014, Eric Parker posted the following on Facebook:

That's what I kept saying when people were calling me the Bundy sniper... my buddy Steven Stewart had to relay to me what what was going on through Binoculars not much good at that distance with open sights. .. now Steve he's got balls head up above that concrete telling me exactly what they were doing after the snipers had been green lighted.

Parker's admission is supported by the following picture with shows Stewart and Parker during the April 12, 2014 assault.



Stewart has not been as brash on social media in discussing his role at the April 12, 2014 assault as his close co-defendants Parker and Drexler. But Stewart is still monitoring the law enforcement response. On February 11, 2015, after co-defendant Cliven Bundy was arrested, Eric Parker took to Facebook and posted: "Okay now I'm pissed. They have Cliven." Parker later posted: "Cool calm and collected boys… Be smart. They will use your words against you." Shortly thereafter, Stewart posted the follwing onto Parker's Facebook page: "Cool calm and collected boys… Be smart. They will use your words against you."

## II. ARGUMENT

The Bail Reform Act provides that a judicial officer shall detain a defendant pending trial where "no conditions or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is appropriate where a defendant poses either a danger to the community or a risk of non-appearance and it is not necessary to prove both. *See United States v. Motamedi*, 767 F.2d

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 18

1403, 1406 (9th Cir. 1985). The Government must establish by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant is a risk of non-appearance. *Id.*

In determining whether pretrial detention is appropriate, Section 3142 provides four factors for the Court to consider: (1) the nature and circumstances of the offense charged, including whether the offense charged is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by the defendant's release. *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); 18 U.S.C. § 3142(g).

Where, as here, there is probable cause to believe that the defendant has committed an offense under Title 18, United States Code, Section 924(c), the court shall presume, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(B).

At the detention hearing, the Court may properly rely upon a proffer by counsel in determining a defendant's danger to the community or risk of flight. *See United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986) ("'[T]he government may proceed in a detention hearing by proffer or hearsay.")

A.      **The Offenses Charged Are Based on the Defendant's Violent Assault on Federal Law Enforcement Officers**

Crimes of violence for purposes of the Bail Reform Act include any offense that has as "an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," and is a felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *See* 18 U.S.C. § 3156(a)(4)(A). Here, eight of the Counts contained in the

Superseding Indictment against Stewart are crimes of violence: assault on a federal officer with a firearm and deadly weapon; threatening federal law enforcement officers; extortion by force and violence; conspiracy to impede and injury a federal officer; and Section 924(c) counts as to each.

Stewart forced federal law enforcement officers to abandon their duties at gunpoint. He believes his lawless act was justified then and he believes it's justified now. As shown above, he says he would do it again and that he, and others, have some twisted right to supposedly "protect" themselves from law enforcement actions including their own arrest for the crimes they committed.

Stewart has shown he is violent and lawless. As such, he presents a danger to the law enforcement community and, for that matter, anyone who seeks to enforce laws against Stewart that Stewart believes are "tyrannical." In Stewart mind, only Stewart is the judge what laws apply to him and should the court release him, only Stewart will decide when and where those laws will be enforced.

Thus, there are no conditions or combination of conditions that any federal court could impose to protect the community from his lawlessness, whether that community is comprised of the citizens using the public lands or federal law enforcement officers and civilian employees attempting to manage the resources and enforce the laws. All are subject to Stewart's whim and his proclivity to use force and violence to make his point.

**B.      Substantial Evidence Exists Establishing the Defendant's Guilt**

In the immediate aftermath of the April 12 assault, federal law enforcement officers were forced to abandon the impoundment site, precluding them from conducting an immediate investigation. Out of safety concerns and the need to deescalate the violence and restore order, the remaining local law enforcement officers – who themselves were outnumbered by Bundy's

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 20

Followers – allowed the gunmen and the conspirators simply to leave the site without making any arrests, conducting any interviews, taking any statements, or obtaining any identification of the gunmen and other assaulters.

Absent contemporaneous arrests and identifications, the investigation became purely historical in nature. The presence of many gunmen in and near the area of Bundy Ranch, the armed checkpoints and patrols, the presence of assault weapons in the militia camps, including (by some accounts) a .50 caliber machinegun, further increased the difficulty of conducting a physical investigation of Bundy Ranch or the impoundment site.

All of that said and despite those obstacles, the investigation began the day after the assault and continues to this day, identifying the assaulters, where they came from, how they got to Nevada, their connections to Bundy and others and their role in the assault and the aftermath.

To date, the government has conducted hundreds of witness interviews; executed dozens of search warrants; reviewed, organized and analyzed hundreds of thousands of pages of documents (mostly from social media); reviewed, organized and analyzed thousands of pages of telephone records; and organized, reviewed and analyzed hundreds of hours of audio and video recordings.

In addition to his oral and written statements captured on social media, Stewart is captured in photographs and on video assaulting federal officers. The evidence overwhelmingly establishes that Stewart was actively involved as a gunman in the conspiracy to assault and extort federal law enforcement officers conducting impoundment operations on April 12.

### C. The Defendant's History and Characteristics Demonstrate the Danger and Risk of Non-Appearance He Poses

Stewart has used guns against law enforcement officers and stated that he would have been a "martyr" on April 12, 2104, further making him an unlikely candidate for court-ordered

supervision.  At a minimum, any release order would require Parker to abide by all laws.  There is no evidence to suggest that he has changed his mind about that or about his twisted view of the violence at Bundy Ranch, his role in it, or about federal law enforcement officers in general. Simply put, Stewart believes his has a right to use a gun when he disagrees with the law.

Stewart also faces a potentially lengthy prison sentence if convicted of the current charges, including a consecutive seven year mandatory minimum sentence under 18 U.S.C. 924(c). He has a strong incentive to flee because of the likelihood of a significant prison sentence if he is convicted. *United States v. Townsend*, 897 F.2d at 995 ([F]acing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight.").

**D.    The Defendant Poses A Significant Danger to the Community**

Stewart's conduct in April, 2014, risked hundreds of people's lives – he assaulted federal officers using his high-power assault rifle.  But for the courageous restraint of these officers, this violent assault would likely have met with violent and deadly ends.

There is simply no evidence to suggest that Stewart will not put federal law enforcement officers, civilian employees, and community members at risk as again just like he did on April 12, 2104.

**E.    Only Pretrial Detention Will Reasonably Assure the Safety of Others and the Community and the Defendant's Future Appearance**

There is no evidence to rebut the presumption of detention in this case.  The charges, the evidence, the defendant's history and the danger posed by his continued release all show that detention is warranted here.  As already discussed, any terms of release would have to include that Stewart obey all laws.  He cannot follow that – he has stated and demonstrated that will not adhere to laws he does not believe in.

GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 22

Even the most stringent of conditions are insufficient to assure the safety of the community or the appearance of Stewart given that ultimately, they must rely on the Stewart's good faith compliance. *See United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (Noting that although the defendant and pretrial services proposed "strict' conditions, "they contain[ed] one critical flaw. In order to be effective, they depend on [the defendant's] good faith compliance."); *see also Tortora*, 922 F.2d 880, 886 (1ˢᵗ Cir. 1990) (concluding that an extensive set of release conditions contained "an Achilles' heel ... virtually all of them hinge[d] on the defendant's good faith compliance"). In *Tortora*, an alleged member of a prominent mafia family stood trial for crimes under the racketing and organized crime statute. The First Circuit considered the elaborate conditions proposed that would restrict any communications with the defendant's cohorts. Ultimately, the court rejected those conditions, recognizing that "the conditions as a whole are flawed in that their success depends largely on the defendant's good faith-or lack of it. They can be too easily circumvented or manipulated." *Tortora*, 922 F.2d at 886.

Such considerations are doubly present here, given that Stewart's crimes in this case are rooted in his defiance of federal court orders, and that his commitment to flouting federal authority has been maintained in word and deed through the present.

## III. CONCLUSION

For the reasons stated herein, Stewart is a danger to the community and a poses a risk of non-appearance and that no condition or combination of conditions will reasonably assure the

safety of others or his appearance at future proceedings. Accordingly, the Government

respectfully requests that the Court order Stewart detained pending trial.

Dated this 3rd day of March, 2016.


WENDY J. OLSON
UNITED STATES ATTORNEY
By:


*/s/ Justin D. Whatcott*
JUSTIN D. WHATCOTT
Assistant United States Attorney


CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 3, 2016, the foregoing **GOVERNMENT'S
MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION** was electronically filed
with the Clerk of the Court using the CM/ECF system, and that a copy was served on the
following parties or counsel by:

| | |
|---|---|
| Daniel Skinner<br>Cantrill, Skinner, Lewis, Casey, & Sorensen<br>PO Box 359<br>Boise, ID 83701<br>danskinner@cssklaw.com<br>*Attorney for Steven A. Stewart* | ☐ United States Mail, postage prepaid<br>☐ fax<br>☒ ECF filing<br>☐ email |


*/s/ Kate Curtis*
Legal Assistant


GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION - 24

# Attachment B



# Attachment C

Steven Arthur Stewart is a reliable man who has been an integral part of our community for years. He has had struggles in the past but has overcome them through determination and he takes pride in becoming a better man for himself and his children. He has been responsible for not only his two children, ages 12 and 6, but also a step-daughter 9 and his ex-wife's step-son 8 years old. His ex-wife, Lynn Stewart, has a strong and good relationship with him even after their divorce. Plus, he regularly babysits for his best friend, Bill Freer our local firefighter of the year, who has 3 children 10, 6, and 3. Their eldest has autism and through this he has shown an abundance of patience and care. Also, just prior to these proceedings he began firefighter training with the assistance of Bill Freer.

Since beginning his job at Albertson's in Hailey, ID in 2012 in the meat department he never came in late, nor did he miss work. A highlight for him was showing off lobsters to the school children on field trips and having daily interactions with members of our community. In 2015 he began working in excavation for B&G Dirt Works in Bellevue, ID and again has proven he is never late, nor calls in. In this position he has continued to link himself to a large array of high standing members of our community by working with them on their homes and businesses.

Per Greg Greenfield his drug court therapist who has worked in his private practice in Blaine County for 20 years:
Steve made every court, AA, NA, and counseling meeting. Not just on time but always early. He was present at 7:00 every morning ready to find a job. He fulfilled his community service hours without lapse or resistance. Greg Greenfield said he was the best they ever had. They learned as much from him as he did from them. Everyone we spoke to that he worked with through drug court considered him an honorable man and a good role model to the community.

There is such a large support system for him. We will help to ensure he makes it to all court proceeding and probation proceedings. He wants to overcome this and we will be here to help him.
Steven Arthur Stewart is well respected. Without him, his family is lost. We need him. Please, Judge Dale, let him come home.

Leann Baily
3/9/16

To: Whom it may concern.

Hello my name is Bill Freer. I am a Firefighter/Ems provider for the city of Hailey Fire Department. I am also Steven Stewart's best friend. I am writing this letter to vouch for his character. I've know Steve for 13 years.

Steve is a great guy. He is a loving father of 2 children who miss him. I have 3 kids that all call him uncle Steve ages 3,6 and10. My 10 year old is autistic,Steve is the of the only people, Myself and my wife trust to care for our children. He is wonderful with our autistic son. He is a part of our family.

Steve has a giant heart and will do anything he can to help anyone at the drop of a hat. He has helped my family and many others when in need several times He is a devoted father that would do anything for his kids. He has a full time job at B&G dirt works as a driver.

I've never know Steve to run away from a problem, he faces it and works out a solution. Steve is a honest man that will tell it like it is. He works hard and try's to provide the best he can for his children, and family. His kids are lost without him.

Steve also has a girlfriend whom has a daughter who Steve cares for and treats like his own. He is a loving man to Leann and she misses him greatly.

I can always count on Steve for anything from moving heavy stuff to watching my kids or my house to dog sitting. He is always there for those who need him.

Steve is not perfect, He has his flaws like everyone. Ive watched him overcome his alcohol problem and succeed through the drug court program. He has worked to overcome the obstacles that he has faced. Since I met him, I've watched him grow as a person, from a young man with some anger issues, to the most devoted father a kid could ask for. He worked through a divorce and started over, overcoming it and adapting. When his ex wife moved to Hailey he followed to be with his kids, and is still a big part of her life as well.

If released he would not be a risk of flight, He is Rooted in Hailey by his children he would never leave, and his family, Which I consider him. Please let him come home to his children and family.

Sincerely

*Bill Fr.*

Bill Freer

# Attachment D

AO 199A (Rev. 12/11) Order Setting Conditions of Release | Page 1 of __3__ Pages

# UNITED STATES DISTRICT COURT
### for the
### District of Idaho

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. **MS16-8428-CWD** |
| **Steven A. Stewart** | ) | |
| *Defendant* | ) | |

## ORDER SETTING CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release is subject to these conditions:

(1) The defendant must not violate federal, state, or local law while on release.

(2) The defendant must cooperate in the collection of a DNA sample if it is authorized by 42 U.S.C. § 14135a.

(3) The defendant must advise the court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number.

(4) The defendant must appear in court as required and, if convicted, must surrender as directed to serve a sentence that the court may impose.

The defendant must appear at: **Lloyd D. George United States Courthouse,**

**333 Las Vegas Blvd South, Las Vegas, NV 89101-7065**
Place

on **as directed**
Date and Time

If blank, defendant will be notified of next appearance.

(5) The defendant must sign an Appearance Bond, if ordered.

AO 199B (as modified by the District of Idaho - Rev. 5/2015)  Additional Conditions of Release                                    Page 2 of 3 Pages

## ADDITIONAL CONDITIONS OF RELEASE

( ) (6)   IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

    Person or organization _____

    Address *(only if above is an organization)* _____

    City and state _____  Tel. No. _____

who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

                              Signed: _____    _____
                                                      *Custodian*                             *Date*

(✓) (7)   The defendant must:

    ( ✓ ) (a)   submit to supervision by and report for supervision to   Pretrial Services as directed ,

    ( ✓ ) (b)   continue or actively seek employment.

    ( ) (c)   continue or start an education program.

    ( ✓ ) (d)   surrender any passport to:   Pretrial Services

    ( ✓ ) (e)   not obtain a passport or other international travel document.

    ( ✓ ) (f)   abide by the following restrictions on personal associations, residence, or travel.  The defendant's travel shall be restricted to: (✓) the District of Idaho, unless pre-approved by Pretrial Services (✓ other - **District of Nevada for Court purposes.  Travel plan to be pre-approved by PTS.**

    ( ✓ ) (g)   avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including:   **all co-defendants**

    ( ) (h)   get medical or psychiatric treatment:   as directed by the pretrial services officer
           ( ) You must pay all or part of the cost of the testing based upon your ability to pay as determined by the pretrial services officer.

    ( ) (i)   return to custody each _____ at _____ o'clock after being released at _____ o'clock for employment, schooling, or the following purposes:

    ( ) (j)   maintain residence at a residential re-entry center, as the pretrial services office or supervising officer considers necessary, and comply with all rules and regulations of the facility.

    ( ✓ ) (k)   not possess a firearm, destructive device, or other weapon.

    ( ✓ ) (l)   not use alcohol ( ✓ ) at all  ( ) excessively.

    ( ) (m)   not frequent establishments where alcohol is the primary item of sale.

    ( ✓ ) (n)   not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.     ( ✓ ) not use or unlawfully possess drug paraphernalia.

    ( ✓ ) (o)   submit to testing for a prohibited substance if required by the pretrial services office. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing.  The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited substance screening or testing.
           ( ) You must pay all or part of the cost of the testing based upon your ability to pay as determined by the pretrial services officer.

    ( ✓ ) (p)   participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services officer.
           ( ✓ ) You must pay all or part of the cost of the testing based upon your ability to pay as determined by the pretrial services officer.

    ( ) (q)   participate in one of the following location monitoring programs and comply with all the program requirements which
           ( ) will  ( ) will not include location monitoring technology as directed by the pretrial services officer.
           ( )  (i)  **Curfew.** You are restricted to your residence every day ( ) from _____ to _____, or ( ) as directed by the pretrial services office.
           ( )  (ii)  **Home Detention.** You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial services officer;
           ( )  (iii)  **Home Incarceration. (This condition requires technology)** You are restricted to 24-hour-a-day lock-down at your residence except for medical necessities and court appearances or other activities specifically approved by the court.
           ( ) You must pay all or part of the cost of the program based on your ability to pay as determined by the pretrial services officer.

    ( ✓ ) (r)   report as soon as possible, to the pretrial services officer, every contact with law enforcement personnel, including arrests, questioning, or traffic stops.

    ( ) (s)   submit to search of person, residence, or vehicle at the request of the pretrial services officer and shall permit seizure of any contraband found therein.

    ( ) (t)   provide the pretrial services officer with any requested financial information and shall not open any new lines of credit without the pretrial services officer's approval.

    ( ✓ ) (u)   maintain current residence and shall not move or change residences without prior approval of the pretrial services officer and obey established rules of the household.

    ( ✓ ) (v)   have no contact with any persons engaged in criminal activity, or who are using or possessing any controlled substances.

    ( ) (w)   do not possess or use a device with internet access ( ) or access the internet, without prior permission from the pretrial services officer.

    ( ) (x)   _____

    ( ) (y)   _____

## ADVICE OF PENALTIES AND SANCTIONS

TO THE DEFENDANT:

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year. This sentence will be consecutive (*i.e.*, in addition to) to any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) a misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of the Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed. I am aware of the penalties and sanctions set forth above.

_Steve Stewart_
_____
Defendant's Signature

_Hailey, Idaho_
_____
City and State

### Directions to the United States Marshal

(  ) The defendant is ORDERED released after processing.

( ✓ ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judge that the defendant has posted bond and/or complied with all other conditions for release. If still in custody, the defendant must be produced before the appropriate judge at the time and place specified. *may be released subject to the above combination of conditions. Order of release is stayed pending review by U.S. District Court for District of Nevada.*

Date: _March 9, 2016_

_____
Judicial Officer's Signature

Candy W. Dale, United States Magistrate Judge
_____
Printed name and title

DISTRIBUTION:    COURT    DEFENDANT    PRETRIAL SERVICE    U.S. ATTORNEY    U.S. MARSHAL